**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Arthur MAEZ, Defendant–Appellant.**

**No. 88–1128.**

United States Court of Appeals,
Tenth Circuit.

April 19, 1989.

Stephen P. McCue, Asst. Federal Public Defender (Ann Steinmetz, Federal Public Defender, Albuquerque, N.M., was also on the brief), for defendant-appellant.

Paula Burnett, Asst. U.S. Atty. (William L. Lutz, U.S. Atty., and Robert J. Baca, Asst. U.S. Atty., Albuquerque, N.M., were also on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, BRORBY, Circuit Judge, and ANDERSON, District Judge *.

HOLLOWAY, Chief Judge.

Defendant Maez (Maez) was charged with armed bank robbery, a violation of 18 U.S.C. § 2113(a) & (d) (1982) and aiding and abetting, a violation of 18 U.S.C. § 2 (1982). He filed a pretrial motion to suppress evidence seized during a search of his home and truck and incriminating statements he made thereafter. That motion was denied after a suppression hearing and the evidence was admitted at trial. Maez was convicted. He appeals, arguing that the motion to suppress should have been granted.

The paramount question presented is whether a violation of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), occurred when a number of armed officers and a SWAT team, having no warrant for an arrest, surrounded a mobile home occupied by Maez, his wife and children, and over loud speakers asked the occupants to remove themselves from the home, which they did, Maez then being taken into custody. We hold that a violation and unlawful arrest occurred. Because evidence obtained after the arrest and admitted at trial over Maez' objection was tainted, we reverse.

I

*Factual Background and Procedural Posture*

A.

*The Arrest of Maez*

Two men robbed an Albuquerque bank on Friday, August 14, 1987. A bank customer reported that an early 1960's Ford or Dodge pickup truck with a wooden tailgate and a New Mexico license plate number KO–1919 was involved in the robbery. There was no such number, but an FBI dispatcher found that license number KD–1919 belonged to a 1959 Ford pickup truck registered to Maez. A description of the truck, both robbers, and Maez' address was given over the radio.

Deputy Sheriff Pacheco heard the broadcast at 3:00 p.m. He knew Maez and contacted a confidential informant who knew where Maez lived. The informant directed Pacheco to the Maez' home. At the home he saw a truck matching the description he had been given. By now it was 3:30 p.m. II R. 18–19. Pacheco left and the Albuquerque police department and FBI were contacted. The Maez home was left unguarded between approximately 3:30 and 4:30 p.m. Pacheco returned at approximately 4:30 p.m. after meeting with his supervisor. From that point on the trailer (which had only one exit—the front door) was under surveillance. The truck at the residence was later identified as the getaway truck.

Several Albuquerque police officers, a SWAT team and the FBI met in a restau-

* The Honorable Aldon J. Anderson, United States District Judge for the District of Utah, sitting by designation.

rant parking lot to plan Maez' arrest.[1] They arrived at the Maez' home between 6:00 and 6:30 p.m. III R. 106. SWAT team members dressed in black surrounded the trailer and (over loud speakers) asked the occupants of the home to come out. II R. 38–39; III R. 143. None of the officers went to the door. Mrs. Maez heard some commotion outside. When she looked out the front door she saw her fifteen year old son walking across the street with his hands in the air. She watched as he was searched and handcuffed. An FBI agent testified the boy was handcuffed; he was never a suspect in the robbery however. III R. 132. There were rifles pointed at the house. III R. 152. Mrs. Maez told her husband what was happening and he looked outside and said, "we have to go outside...." III R. 152. Mr. and Mrs. Maez were told to exit one at a time.

### B.

### *Mrs. Maez' Consents to Search*

By the time Mrs. Maez had left the trailer it was approximately 6:45 p.m. II R. 49–50; III R. 75. She was escorted, with her two month old baby, outside the trailer park fence, past approximately ten police officers and into the presence of five more. Shortly thereafter, she was asked to read and sign consent forms authorizing a search of the trailer. She owned the trailer. Police officer Whitson filled in the blanks on an Albuquerque police depart-

ment consent form and explained the form to Mrs. Maez before she signed it.[2] Mrs. Maez was given time to read the form.[3] No evidence was seized pursuant to this consent. II R. 44–45.

After she had signed the Albuquerque police department consent form, Mrs. Maez was asked to sign an FBI consent to search form. Agent Guyman explained that they would be looking for money, weapons, or clothing. He told Mrs. Maez that her husband had been arrested. Guyman filled out the form and had Mrs. Maez read it out loud. Agent Marrero, who was present when the form was signed, testified that Mrs. Maez was visibly upset when she signed the form. She said that she signed the forms only because she had to. III R. 97, 157.[4] A bag containing $5,800, a blue stocking cap, a box of ammunition, and two red bandannas were seized. Mrs. Maez signed a third consent to search form relating to her personal automobile; no evidence was seized from the automobile.[5]

### C.

### *Maez' Interrogation*

Maez was taken into custody by the Albuquerque Police Department and turned over to the FBI at approximately 7:15 p.m. The officers asked if they could search the trailer and vehicles and when they indicated they had no search warrant, Maez

1. It is not clear from the record precisely when the meeting took place. FBI agent Garay testified that it began around 4:00 p.m. III R. 130. Police officer Whitson said that he was at the meeting between 4:30 and 5:00 p.m. II R. 46. Agent Guyman said that he was at the meeting at 5:45 p.m. III R. 73.

2. This first consent to search form was obtained so that the officers could enter the trailer to search for Maez, who had not yet exited. By the time the form was signed, he had exited.

3. The form indicates that there is a constitutional right to deny permission to search the property. I R. 11, Exh. C.

4. Mrs. Maez also testified that before she signed the Albuquerque police department consent form she was told that the officers did not have

a warrant to search the house, but could get one. III R. 156. She thought that she would have to wait outside while they were getting the warrant if she did not sign the consent form. During this time Mrs. Maez was holding their baby. II R. 56; III R. 156, 158.

5. The dissent's focus on the voluntariness of the third consent and its quotation of testimony about it are misplaced. Nothing was seized pursuant to the third consent to search. Its validity is not at issue. We note this because the consent to search which is at issue, the second consent to search, preceded this third consent to search the automobile. In fact, the third consent form was signed over an hour after the search of the trailer. III R. 85. It is difficult to validate the second consent by events which occurred over an hour after it was signed.

said no.[6] He was then taken to an interview room where he was given *Miranda* warnings and signed a waiver of rights form. There was no conversation prior to their arrival. It was now 8:00 p.m. Maez' interrogation lasted for an hour and one half. II R. 35. He signed a consent to search form relating to his truck during the interrogation. Guyman was called and he searched the truck.

During the interrogation FBI agent Garay asked Maez about the dark veins on his arm. Maez admitted that he used heroin three times a week and said that he had taken two valiums two hours before he was taken into custody. III R. 122. Maez explained that he had been driving his pickup in the vicinity of the bank (picking up pop cans) on the day of the robbery. He also admitted ownership of the cap found outside the bank doors. However, when Agent Denniston explained where it had been found, Maez denied that it was his. Agent Garay testified that about three quarters of the way through the interview, Maez vomited. III R. 135. The interview continued. Garay testified that Maez did not appear to him to be confused, frightened, or under the influence of drugs. Maez said that he felt dizzy from the valiums and that he was confused by the questions of the three officers. III R. 145–146.

### D.

### *The Trial Court's Ruling on the Motion to Suppress*

The trial court orally denied the motion to suppress. The court found that "there was probable cause to arrest the defendant," a fact not disputed on appeal. II R. 162–164. The court further found that Maez was arrested "legally ... after he came out of his trailer." II R. 164.

The court found that "while the circumstances may have been tense and while the

environment may not have been ... ideal ..., that nevertheless [Ms. Patsy Maez] voluntarily and willingly gave the officers a permission to search." II R. 164. The court concluded that all of the items which were seized from the trailer were "legally and validly taken under the permission to search...." II R. 164.

The court further found that after being given *Miranda* warnings, Maez willingly and knowingly gave permission to search the Ford pickup "in which the holster was found." II R. 165. The court held that the statements made by Maez, including the statements regarding his cap, were "knowingly and willingly given" after he had been given *Miranda* warnings. II R. 165.

### E.

### *Evidence At Trial*

At trial, bank teller Christina Carlsen testified that one of the robbers was wearing a hat and had a red bandanna over his face. The bandanna, which was found during the search of the trailer conducted pursuant to the FBI consent form signed by Mrs. Maez, was admitted into evidence. Carlson identified Maez as the taller of the two robbers and the one who struck Mariana Griego, another teller, unconscious with the gun he was carrying. Griego identified Maez as one of the robbers. IV R. 111. She said that he put a gun under her chin. Griego said that although she could not clearly see his face during the robbery (because it was covered by the bandanna and he was wearing a cap), she was able to see his eyes, a mustache, and dark graying hair. She remembered Maez being about five feet seven inches tall. Griego also said that she recognized a number of tattoos on Maez' arms and on the web of his thumb. IV R. 105–114.

On the way out of the bank, one of the robbers hit Ernest Harrison, Jr., vice presi-

---

6. Maez said that he and his wife communicated with their heads regarding consent to search their trailer. "[S]he was reading the paper and she went like this, you know, and something like that (indicating), you know, to let me know if it's all right if they can search the trailer. I told her 'Well, it's your trailer. It's up to you,' and I shook my head up and down, to go ahead if she wanted to, because the trailer is under her name." III R. 145. Mrs. Maez said that she had no communication with her husband, although she was not asked specifically about nonverbal communication.

dent of the bank (and a former FBI agent) and knocked him to the ground. The taller robber's hat fell off. Harrison followed the robbers around a corner and saw them leaving in a light colored pickup with a wooden tailgate. He said that the taller robber was wearing grey pants and was approximately five feet nine inches tall. IV R. 42–43. At the same time, a bank customer, Michael Barnes, saw what he thought was a gun and followed the truck to see the license plate number. He reported the number and also described the truck as an early 1960's Ford with a wooden tailgate. He testified that the taller robber was wearing a light blue shirt. He also identified photographs of the truck.

A box of .25 caliber ammunition, which was found in Maez' trailer during the search, was admitted in evidence, as were the bandannas, cash totalling $5,844, and various pictures of the items seized. The cash consisted of 294 one dollar bills, 118 five dollar bills, 71 ten dollar bills, 120 twenty dollar bills, 7 fifty dollar bills, and 15 one hundred dollar bills. The bank had baited four twenty dollar bills, but none were found in the trailer. No guns or bank wrappers were found.

Agent Garay testified that a holster had been found in Maez' truck, but the holster itself was never offered in evidence. Agent Denniston testified regarding statements Maez made during his interrogation. Maez said he had been driving his truck in the vicinity of the bank (picking up cans). Maez denied the robbery, and claimed that the money found in the trailer was his. Denniston also testified that Maez admitted that the cap was his, and then recanted after being told that it had been found outside the bank.

The sole defense witness was Mrs. Maez. She testified that when her husband left the trailer on the morning of August 14, 1987, he was wearing tennis shoes, green khaki pants, a white shirt, and a yellow hat. Later that day she left. When she returned around 3:00 p.m. Maez was there,

wearing the same pants and a t-shirt. Mrs. Maez brought three of her husband's hats to court, all of which were admitted in evidence.

The jury returned a guilty verdict. Maez filed a motion for a new trial, arguing that Griego's identification was impermissibly suggestive and unreliable, violating his due process right to a fair trial. The trial court denied the motion and a timely notice of appeal was filed.

## II

### Analysis

Maez argues that his arrest at his home without a warrant violated the Fourth Amendment and that evidence subsequently obtained was tainted. We first consider whether Maez' arrest was lawful. If his arrest was unlawful, we must then decide whether the subsequent consents to search given by Mr. and Mrs. Maez and Maez' incriminating statements were tainted by the unlawful arrest.

### A.

### Maez' Warrantless Arrest

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In *Payton v. New York*, 445 U.S. 573, 576, 590, 100 S.Ct. 1371, 1375, 1382, 63 L.Ed.2d 639 (1980), the Supreme Court held that, absent exigent circumstances, police officers may not enter an individual's home without consent to make a warrantless routine felony arrest even with probable cause.[7] In the instant case, police officers, FBI agents and a SWAT team surrounded the Maez' trailer, and with guns pointed at the home, asked him and his family to come

---

7. A warrantless arrest in public with probable cause does not violate the Fourth Amendment, even though exigent circumstances do not exist. *United States v. Watson,* 423 U.S. 411, 423–24, 96 S.Ct. 820, 827–28, 46 L.Ed.2d 598 (1976).

out. They did and Maez was taken into custody.

### i

### The Application of Payton

■ An arrest or seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. . . ." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). *See also Dunaway v. New York*, 442 U.S. 200, 207 n. 6, 99 S.Ct. 2248, 2253 n. 6, 60 L.Ed.2d 824 (1979). A show "of official authority such that 'a reasonable person would have believed he was not free to leave'" indicates that an arrest has occurred. *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Justice Stewart joined by Justice Rehnquist)). "Examples of circumstances that might indicate a seizure, even when the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. "[T]he determination of whether an arrest has occurred is not dependent on whether the citizen is formally placed under arrest. . . ." *United States v. Hatfield*, 815 F.2d 1068, 1071 (6th Cir.1987) (quoting *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir.1986), *cert. denied*, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987)).

■ The government argues that Maez "chose to exit his home. He was arrested in a public place." Brief of Appellee at 14. And the trial court found that Maez "was requested to come out of his home, or out of the trailer in which he was living and he was arrested after he came out into the open." II R. 164. We cannot agree in light of the undisputed facts. The Albuquerque SWAT team had surrounded the Maez' trailer with rifles pointed at the home. II R. 39–41; III R. 152. Over the loud speakers the occupants "were asked to remove themselves from the mobile home . . . ," as Officer Whitson testified. II R. 39. Mrs. Maez saw the officers with rifles pointed at the house and her son being searched and handcuffed. She told her husband what had happened. "[H]e went to the door and he looked out and he said, [']We have to go outside,['] and he got the baby and we were going outside." III R. 152. Given the presence of some ten officers, the drawn weapons of the SWAT team surrounding the trailer, the use of the loudspeakers, and the frightening circumstances his family faced, a reasonable person would have believed he had to come out of the home and submit to the show of authority. Accordingly, we hold that Maez was arrested while in his home.[8]

The government strenuously argues that *Payton* does not apply here because there was no warrantless entry into Maez' home. It says that the Court drew a firm line at the threshold of the home. Brief of Appellee at 11–14. The contention has considerable force because *Payton* does make repeated references to entry such as "nonconsensual entry into a suspect's home. . . ." 445 U.S. at 576, 100 S.Ct. at 1375. The Court said the Fourth Amendment "has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590, 100 S.Ct. at 1382. And the Court noted that "'physical entry of the home is the chief evil against which the wording of

---

**8.** As noted, the trial judge found that the "defendant was arrested legally. He came out of his— he was requested to come out of his home, or out of the trailer in which he was living and he was arrested after he came out into the open." III R. 164.

We review the findings on a motion to suppress under the clearly erroneous standard. *United States v. Alonso*, 790 F.2d 1489, 1493 (10th Cir.1986). However, where only an ultimate finding such as consent is made and there are undisputed underlying facts supporting a contrary conclusion, that conclusion may be drawn by the appellate court. *See United States v. Recalde*, 761 F.2d 1448, 1455 n. 7, and 1456 (10th Cir.1985) (citing *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)).

the Fourth Amendment is directed.' " *Id.* at 585, 100 S.Ct. at 1379 (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972)).

It is true also that *Payton* involved cases where police officers, acting with probable cause but without a warrant, entered the defendants' homes to make arrests. In the case of Payton, the officers used crowbars to break open the door and enter the apartment. *Payton,* 445 U.S. at 576–77, 100 S.Ct. at 1374–75. In the case of Riddick, the officers knocked on the door of the house where Riddick lived, and when his son opened the door, entered and arrested Riddick. *Id.* at 578, 100 S.Ct. at 1376. In both cases there was physical entry. The government argues that *Payton* does not condemn the arrest in this case because the officers did not physically enter the trailer.

We are persuaded, however, by the decisions of the courts which have applied *Payton* where a physical crossing of the threshold did not occur and their reasoning that the lack of physical entry alone is not dispositive. Those courts have held that *Payton* is violated where there is such a show of force that a defendant comes out of a home under coercion and submits to being taken in custody. *United States v. Al–Azzawy,* 784 F.2d 890, 893 and n. 1 (9th Cir.1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *United States v. Morgan,* 743 F.2d 1158, 1164 (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *Scroggins v. State of Arkansas,* 276 Ark. 177, 633 S.W.2d 33, 37 (1982). *Cf. United States v. Edmondson,* 791 F.2d 1512, 1514–15 (11th Cir.1986) (FBI agents, with weapons drawn, knocked on door, directed occupant to open the door, which he did, and agents arrested him inside). In both *Al–Azzawy* and *Morgan,* as in the case now before us, the police had surrounded the defendants' homes and requested their exit by bullhorn. Both courts reasoned that *Payton* was violated. *Al–Azzawy,* 784 F.2d at 893; *Morgan,* 743 F.2d at 1166. "In these circumstances, it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." *United States v. Al–Azzawy,* 784 F.2d at 893. We agree and think the important point is that in cases of physical intrusion, or coercion to leave the home, as in this case, the privacy of the home is effectively invaded. Commentators have endorsed such a view of *Payton* where a defendant's coming out of his home resulted from coercion. *See* 2 LaFave, *Search and Seizure* § 6.1(e) at 592–94 (2nd ed. 1987).

*Payton* recognizes that at the "very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." 445 U.S. at 589–590, 100 S.Ct. at 1381–1382 (quoting *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961)). While "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" the Court has "refused to lock the Fourth Amendment into instances of actual physical trespass." *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). Here the governmental intrusion, without consent and without a warrant, was in the form of extreme coercion which effected the arrest of Maez while he was in his home. We hold that the finding of the trial judge to the contrary is clearly erroneous and that, given the undisputed circumstances here, there was a violation of Maez' Fourth Amendment rights.

ii

*Exigent Circumstances*

In addition to its argument—which we have rejected—that there was no arrest of Maez in the home, the government says that both probable cause for the arrest and exigent circumstances existed so that there was in any event no violation of *Payton.* Brief of Appellee at 13, 15. Emergency conditions may make a warrantless search or arrest constitutional where probable cause exists, *see Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097–98, 80 L.Ed.2d 732 (1984), and here Maez does not dispute the existence of such prob-

able cause. Moreover, *Payton* recognized that if exigent circumstances exist, the constitutional bar against a suspect's arrest in his home without a warrant does not apply. 445 U.S. at 590, 100 S.Ct. at 1382. Here, however, Maez contends there was no assertion of exigency made in the trial court by the government's law enforcement witnesses or its counsel. Appellant Maez' Reply Brief at 12.[9] We agree and reject the government's argument of exigent circumstances made for the first time on appeal.

■ We cannot accept the government's belated assertion of the exigent circumstances claim for basic reasons. Where police seek to enter a home without a warrant the state bears the burden of proving that sufficient exigency exists. *United States v. Aquino*, 836 F.2d 1268, 1271 (10th Cir.1988) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971)). That burden is particularly heavy where the police seek to enter a suspect's home or the home of a third person because warrantless seizures inside a home are presumptively unreasonable. *Aquino*, 836 F.2d at 1271 (quoting *Payton*, 445 U.S. at 586, 100 S.Ct. at 1380). It is important that the facts on exigent circumstances be developed and that findings be made on them. *E.g., United States v. Cuaron*, 700 F.2d at 586–91.

■ In the *Payton* opinion itself, the Supreme Court noted that while it was arguable that the warrantless arrest of Payton might have been justified by exigent circumstances, none of the lower courts had relied on any such justification and accordingly the Court had no occasion to consider such an emergency or dangerous situation. 445 U.S. at 583, 100 S.Ct. at 1378. In *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the government argued for the first time on appeal that the record did not clearly show that the petitioner, who was arrested in a third party's house, had a reasonable expectation of privacy in the home. The Court declined to grant the government's request for a remand for factual findings on the issue:

> ... [T]he Government was initially entitled to defend against petitioner's charge of an unlawful search by asserting that petitioner lacked a reasonable expectation of privacy in the searched home, or that he consented to the search, *or that exigent circumstances justified the entry. The Government, however, may lose its right to raise factual issues of this sort before this Court* when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, *or when it has failed to raise such questions in a timely fashion during the litigation.*

We conclude that this is such a case. The Magistrate's report on petitioner's suppression motion, which was adopted by the District Court, characterized the issue as whether an arrest warrant was sufficient to justify the search of 'the home of a third person' for the subject of the warrant. App. 12. *The Government never sought to correct this characterization on appeal, and instead ac-*

---

9. The government argues that the record supports the existence of exigent circumstances because: (1) the police knew that one of the bank robbers was armed and had used the butt of his handgun to disable (knock unconscious) a bank customer; (2) a large sum of money had been stolen from a bank; (3) the police had physical descriptions of items worn by the robbers which might be destroyed; (4) Maez might seek to warn the other robber or seek assistance if he should become aware of the presence of the police; and (5) the police knew Maez was a heroin addict and a convicted felon.

Citing *United States v. McConney*, 728 F.2d 1195 (9th Cir.1984) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), the government argues that the existence of exigent circumstances is supported by the record and "dictated the arrest procedure." Brief of Appellee, at pp. 15–16. *McConney* held that the "mixed question of exigency is reviewable de novo as a question of law." 728 F.2d at 1204–05. In *United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir.1983), we said that in assessing whether the government's burden demonstrating exigent circumstances was met, we "evaluate the circumstances as they would have appeared to prudent, cautious and trained officers." (citations omitted). Since we conclude that the government waived its right to raise the issue of exigent circumstances on appeal for reasons stated in the text, we do not undertake an evaluation of the record.

*quiesced in the District Court's view of petitioner's Fourth Amendment claim. Id.* at 209, 101 S.Ct. at 1646 (emphasis added). Here, the government concedes in its brief that it did not argue the issue below. Brief of Appellee, 15–16. In fact, the defendant specifically argued below that exigent circumstances did not exist and the government did not dispute the argument.[10] Hence the district court had no reason to consider the issue.

For these reasons, we must reject the government's argument that its claim of exigent circumstances be taken up for the first time on this appeal.

## B.

### The Taint Caused by the Payton Violation

Having determined that Maez' warrantless arrest violated *Payton* and the Fourth Amendment, we must now go on to consider whether the illegal arrest tainted the consents to search subsequently given by him and his wife and his custodial statements, or whether any taint was sufficiently removed and attenuated by intervening circumstances.

#### i

##### Mrs. Maez' Consent to Search

We first consider whether the consent to search given by Mrs. Maez to the FBI was voluntary in fact so as to remove the taint of Maez' unlawful arrest. A consent to search which is preceded by a Fourth Amendment violation is valid only if it is voluntary in fact. *United States v. Guzman*, 864 F.2d 1512, 1520–21 (10th Cir.1988); *United States v. Carson*, 793 F.2d 1141, 1151 (10th Cir.1986), *cert. denied*, 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed. 2d 289 (1986)). If the consent is not suffi-

ciently an act of free will to purge the primary taint of the illegal arrest, it must be suppressed as fruit of the poisonous tree. *See Guzman*, 864 F.2d at 1520 (quoting *Brown v. Illinois*, 422 U.S. 590, 601, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416 (1975)).

Without citation to authority, the government initially argues that because Mrs. Maez was not arrested,[11] her consent to search the trailer cannot be tainted by her husband's prior illegal arrest. We disagree and think the issue, as stated in *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), is whether "granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." This conclusion is mandated by the Supreme Court's decision in *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). *See also United States v. Howard*, 828 F.2d 552, 556 (9th Cir.1987).

In *Ceccolini*, the defendant (a businessman suspected of gambling) moved to suppress damaging statements of an employee, resulting from an unlawful search of his business premises. *Id.* at 269–72, 98 S.Ct. at 1056–58. The employee was not arrested. The Court rejected the government's argument that "the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment." *Id.* at 274–75, 98 S.Ct. at 1059–60. While the primary issue before the Court was whether a categorical distinction should be drawn between physical and verbal evidence found as the result of an unlawful search, the Court specifically noted that the witness whose testimony was at issue was not a

---

10. In his "Motion To Suppress Physical Evidence" the defendant argued that "[n]o exigent circumstances existed to justify the search of the residence...." I R. 8. The argument was again made in the "Memorandum Brief In Support of Defendant's Motion To Suppress Physical Evidence and Motion To Suppress Statements." I R. 12, p. 6. The government's response brief does not contest these arguments. I R. 11.

11. We accept the government's contention that Mrs. Maez was not arrested only for the sake of analysis, given our conclusion that Mr. Maez was arrested while in the trailer. If under the *Terry, Dunaway, Mendenhall,* and *Royer* arrest analysis, supra, Mr. Maez was arrested, it follows that Mrs. Maez was also arrested. She was in the same position.

defendant. *Id.* at 275, 277, 98 S.Ct. at 1059, 1060–61. The Court nevertheless concluded that " 'verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of the official illegality than the more common tangible fruits of the unwarranted intrusion.' " *Id.* at 275, 98 S.Ct. at 1059 (quoting *Wong Sun,* 371 U.S. at 485, 83 S.Ct. at 416). Thus, the defendant could raise the taint issue as to the statements made by his employee. And while the witness in *Ceccolini* gave statements, as opposed to a consent to search, the same analysis is required here. The question is whether the statements of the witness (or in our case the consent) have "become so attenuated as to dissipate the taint." *Ceccolini,* 435 U.S. at 274, 98 S.Ct. at 1059 (quoting *Wong Sun,* 371 U.S. at 487, 491, 83 S.Ct. at 417, 419).

▮ Whether a consent to search preceded by a Fourth Amendment violation is sufficiently an act of free will to purge the primary taint of the illegal arrest depends upon whether it is voluntary in fact, which in turn depends upon the totality of circumstances surrounding the consent. *See Guzman,* 864 F.2d at 1520 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973) and *Carson,* 793 F.2d at 1149). In applying the *Schneckloth v. Bustamonte* voluntariness test to consents to search obtained subsequent to Fourth Amendment violations, this court has considered the three factors articulated in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), which apply to confessions.

*Guzman,* 864 F.2d at 1520–1521. These factors include "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct...." *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (citation omitted). Weighing these factors the court must decide the ultimate question whether the consent was sufficiently an act of free will to purge the primary taint of the illegal arrest. *See Guzman,* 864 F.2d at 1520. *See also Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983); *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *Carson,* 793 F.2d at 1152; *United States v. Recalde,* 761 F.2d 1448, 1458 (10th Cir.1985).

As noted, the district judge found that Mrs. Maez' consent was voluntarily and willingly given, although he expressed reluctance in making this finding.[12] The judge had also held there was no illegal arrest of Mr. Maez and thus had no reason to consider whether Mrs. Maez' consent was sufficiently an act of free will to purge the primary taint of her husband's unlawful arrest.

▮ When consent is obtained after an illegal arrest there must be a break in the causal connection between the illegality and the evidence thereby obtained. *Dunaway v. New York,* 442 U.S. 200, 217–19, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979). Here the violation of *Payton* and the undisputed train of events that followed compel us to hold that Mrs. Maez' consent was tainted and invalid.[13] First,

---

**12.** The court stated in part:

And I will find that while the circumstances may have been tense and while the environment may not have been that of the most ideal for considering the signing of a permission to search, that nevertheless she voluntarily and willingly gave the officers a permission to search. This is Government's Exhibit 1.

III R. 164–165.

**13.** The district court did not discuss the taint issue resulting from the *Payton* violation. It is not our function to try facts or to substitute our judgment for that of the trial court in determining factual issues. *Guzman,* 864 F.2d at 1521.

However, where the proceedings below "resulted in a record of amply sufficient detail and depth from which the determination may be made," the appellate court may conduct a taint analysis. *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262; quoted in *Guzman,* 864 F.2d at 1521 n. 10. *See also Recalde,* 761 F.2d at 1458–59 (voluntariness determination held clearly erroneous where, although there was some evidence to support it, the entire record indicated that the defendant's consent was tainted); *United States v. Patino,* 830 F.2d 1413, 1418–19 (7th Cir. 1987).

The dissent argues that it is inappropriate for us to conduct a taint analysis, that only the trial

the proximity of the arrest and Mrs. Maez' consents clearly indicate that taint of the *Payton* violation was not purged. The FBI consent form was signed by Mrs. Maez at approximately 7:15 p.m., just after she had been summoned from the trailer by the bullhorn. And when she signed the form she was still in the trailer park. III R. 64–66.

Second, the intervening circumstances indicate no purging of the primary taint of her husband's illegal arrest. After leaving the trailer, Mrs. Maez was immediately asked by Albuquerque police officer Whitson to sign the police department's consent to search form. II R. 39. She was then approached by FBI agent Gyman who explained that the FBI wanted to search for money, weapons, and clothing, and the second consent form was signed. III R. 65–66. There were no intervening circumstances of any significance to purge the taint of the unlawful warrantless arrest of Maez.

With respect to the purpose and flagrancy of the violation, the last *Brown* factor, it

court is in a position to assess credibility and discern truth and that the case should be remanded. But none of the facts relating to the proximity of the arrest and confession, the presence of intervening circumstances, or the flagrancy of official misconduct are in dispute. And these *are* the facts which are crucial to the taint analysis and upon which the government bore the burden of proof. *See Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Guzman,* 864 F.2d at 1520–21; *Recalde,* 761 F.2d at 1457–59. The record is of "amply sufficient detail and depth" for us to conclude, as the Court did in *Brown,* that the taint of the Fourth Amendment violation was not purged. *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62. The suppression hearing developed the circumstances in detail (II R. at 4–58; III R. at 62–162) and the basic facts vitiating the consents and statements are undisputed, as noted throughout our opinion.

Applying the proper test of considering the whole record, and not merely relying on portions as the dissent does to support its view, we are left with the firm conviction that a mistake was made in finding the consents and Mr. Maez' statements valid. The correct standard of review is whether "although there is evidence to support [the findings], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Grier,* 866 F.2d 908, 935 (7th Cir.1989) (quoting *United States v. D'Antoni,* 856 F.2d 975, 978–79 (7th Cir.1988)).

cannot be said that the officers purposefully violated *Payton* in the sense that they were aware of the impropriety of their actions, as was the case in *Brown. See Brown,* 422 U.S. at 605, 95 S.Ct. at 2262. The manner of the arrest, however, created a frightening scene for the Maez family as did Brown's arrest.[14] *Id.* Agent Marrero, who was present when Mrs. Maez signed the FBI consent form, testified that she was crying and upset when she signed the form. She said that she signed the consent forms only because she had to. Before leaving the trailer Mrs. Maez had seen her fifteen year old son walking across the street with his hands in the air, and she watched as he was handcuffed. She was holding her two month old baby from the time she left the trailer throughout the signing of all three consent forms. II R. 41, 56–57. The undisputed facts clearly indicate that the taint of Maez' arrest had not been purged when Mrs. Maez signed the FBI consent to search form and the police department consent.[15]

14. The dissent rejects the majority's view that the circumstances created a frightening scene for the Maez family. The dissent's reasoning is difficult to understand since the dissent accepts the majority's holding that a violation of *Payton v. New York* occurred—that holding being grounded on the frightening scene that exerted "extreme coercion which effected the arrest of Maez while he was in his home." *See supra* at p. 1451. Our *Payton* holding follows state and federal courts which hold that a *Payton* violation occurs where there is such a show of force that a defendant comes out of his home under coercion and submits to being taken into custody. *See supra* at p. 1451. The essential facts leading us to hold there was a frightening scene here were undisputed—the presence of ten armed SWAT team members with rifles pointed at the trailer, the request to come out over the bull horn, and the handcuffing of the fifteen year old son.

15. The dissent contends that our opinion misreads the record. When reviewing the denial of a motion to suppress an appellate court must consider the evidence in the light most favorable to the government and must accept the trial court's findings of fact unless clearly erroneous. *United States v. Jimenez,* 864 F.2d 686, 688 (10th Cir.1988). But an appellate court must not simply consider from the record those facts which might support a trial court's findings and ignore the record as a whole. A trial court's factual

The government argues that Mrs. Maez was advised of her right to refuse consent, both orally and on the consent forms themselves. While this fact is indeed probative it is not dispositive of the voluntariness issue. *Schneckloth*, 412 U.S. at 227, 249, 93 S.Ct. at 2047–48, 2059; *Recalde*, 761 F.2d at 1458–59. We note that Mrs. Maez testified that she was told by the officers that if she refused consent they could simply get a warrant while she waited outside. III R. 156. This tends to undermine any salutary effect that advice of the right to refuse consent might have had. *United States v. Ocheltree*, 622 F.2d 992, 993–94 (9th Cir.1980).

We hold that Maez' illegal arrest tainted the subsequent consents to search the trailer given by Mrs. Maez and that her consents were not " 'sufficiently an act of free will to purge the primary taint' [of the illegal arrest]." *Brown*, 422 U.S. at 602, 95 S.Ct. at 2261 (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416). The evidence seized pursuant to the FBI consent to search form, including the paper bag containing $5,844, the box of ammunition, two red bandannas, and the dark blue knit cap should have been suppressed, along with various photographs of the seized evidence.[16]

### ii

### *Maez' Consent to Search*

After exiting the trailer Maez was taken into custody by the Albuquerque police department. He was then turned over to the FBI and given *Miranda* warnings. He was taken to an interview room at the Albuquerque office of the FBI. He signed a waiver of rights form at 8:00 p.m., approximately 45 minutes after he had been taken into custody. III R. 110–111. He was then interrogated. During the interro-

gation he signed a consent to search form, authorizing a search of his pickup truck. III R. 112–115. Doc. 11, Exh. B. Officer Guyman searched the truck and found a holster. The district judge found that Maez, after being advised of his *Miranda* rights, "willingly and knowingly gave permission to search the Ford pickup...." III R. 165. As was true with respect to Mrs. Maez' consent, the district judge did not discuss the effect of the prior illegal arrest, having held that no violation or unlawful arrest occurred.

To determine whether Maez' consent to search the truck was sufficiently an act of free will to purge the taint of his illegal arrest we again consider the three factors enunciated in *Brown*. The proximity of Maez' arrest and his subsequent consent given 45 minutes later does not indicate that the taint of the *Payton* violation was purged. In *Brown v. Illinois*, Brown's initial statement was separated from his illegal arrest by less than two hours. *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262. The Court there held that Brown's statement, like James Wah Toy's statement in *Wong Sun*, was the fruit of the poisonous tree. *Id.* 422 U.S. at 604–05, 95 S.Ct. at 2262–63. *See also Wong Sun*, 371 U.S. at 486–87, 83 S.Ct. at 416–17. From the time Maez was taken to the FBI interview room he was in the custody of at least three officers, *see* III R. 109, and was initially in the presence of ten. *See Patino*, 830 F.2d at 1418 (taint not purged where defendant continually in the company of one officer). His removal to the interview room does not indicate a break in the causal connection between his arrest and the subsequent consent. *Hayes v. Florida*, 470 U.S. 811, 816, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985); *Dunaway*, 442 U.S. at 212–13, 99 S.Ct. at 2256–57.

determinations in criminal cases, as in civil cases, *see Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985), may be clearly erroneous even where supported by some evidence, if on the whole record the court is left with a firm and definite conviction that a mistake has been committed. *United States v. Grier*, 866 F.2d 908, 935 (7th Cir.1989). *See e.g. United States v. Recalde*, 761 F.2d 1448, 1457–59 (10th Cir.1985) (voluntari-

ness determination held clearly erroneous where, although there was some evidence to support it, the entire record indicated that the defendant's consent was tainted).

16. The photographs referred to are only those photographs of the tainted evidence which were admitted at trial.

With respect to the second *Brown* factor, the effect of any intervening circumstances, the government does not point to and we do not find in the record any circumstances which would tend to dissipate the taint.[17] With respect to the last factor, the purpose and flagrancy of the official misconduct, the manner of the arrest was such that it would cause surprise, fright and confusion. *See Brown*, 422 U.S. at 605, 95 S.Ct. at 2262. Maez testified that he felt dizzy during his interrogation; he vomitted approximately three quarters of the way through the interview, as one of the FBI agents testified. III R. 135. Considering all three *Brown* factors, we hold that Maez' consent to search the truck was not sufficiently an act of free will to purge the primary taint. *See Guzman*, 864 F.2d at 1520.

The government notes that the consent form was signed after Maez had been advised of his *Miranda* rights, which is probative. But as the Supreme Court noted, "[i]f *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." *Brown*, 422 U.S. at 602–03, 95 S.Ct. at 2261. *Miranda* warnings do not per se break the causal connection between an illegal arrest and evidence subsequently obtained. *See Dunaway*, 442 U.S. at 216–17, 99 S.Ct. at 2258–59.

We hold that in these circumstances, notwithstanding the *Miranda* warnings, Maez' consent was tainted by his prior illegal arrest and the testimony regarding the holster should have been suppressed.

## III

### *Maez' Custodial Statements*

During his interrogation Maez explained where he had been and what he had been doing on the day of the robbery. He said that he had been in possession of his pickup throughout the day and had been in the area of the bank. He admitted ownership of a cap shown to him during the interrogation by Agent Denniston. When told that the cap had been found outside the doors of the bank which had been robbed, Maez then denied ownership of the cap. Officer Denniston testified about those statements at trial and the cap was admitted. IV R. 153–160.

The exculpatory and incriminating statements made by Maez during his interrogation are subject to the same analysis as the consent to search the truck. *See Taylor v. Alabama*, 457 U.S. 687, 690–94, 102 S.Ct. 2664, 2667–69, 73 L.Ed.2d 314 (1982); *Brown*, 422 U.S. at 593–95, 95 S.Ct. at 2256–58; *Wong Sun*, 371 U.S. at 486–87, 83 S.Ct. at 416–17 (exculpatory and incriminating statements entitled to the protection of the exclusionary rule). Applying the same *Brown* analysis, which we made earlier, we hold that the statements should have been suppressed.[18]

## IV

The judgment is accordingly REVERSED and the case is REMANDED for further proceedings in accord with this opinion.

BRORBY, Circuit Judge, dissenting.

Although I agree with the majority's application of *Payton v. New York*, 445 U.S.

---

17. The government argues that because Maez refused to consent to a search of his home he was capable of exercising his rights, free from the taint of the illegal arrest. While relevant, this fact is not dispositive. In *Recalde*, the defendant refused to answer questions and yet subsequently signed a consent form; we nevertheless found that consent tainted. *Recalde*, 761 F.2d at 1459.

18. While Maez' Fourth Amendment rights were violated and the evidence outlined in Part B should have been suppressed, we could affirm the conviction if the constitutional errors were harmless beyond a reasonable doubt. *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *United States v. Morales Quinones*, 812 F.2d 604, 610 (10th Cir.1987). The government concedes, however, that if admission of the paper bag containing the money, the box of ammunition, the red bandannas, the photographs, and the dark blue knit cap was error, its admission cannot be considered harmless error. Brief of Appellee, p. 21.

573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), I do not agree that the statements and written consents to search given by Patsy and Arthur Maez are extinguished by the *Payton* violation in this case. Respectfully, I must dissent for two reasons. First, the majority reaches a result not dictated by the record. Second, I cannot endorse the analytical framework of the majority opinion.

Based upon my view of the record, I have no doubt that Patsy and Arthur Maez voluntarily consented to the searches herein. The force of the consents given in this case overcomes the taint placed by the *Payton* violation. The same is true of the statements made by the defendant. The majority reaches its conclusion only by disregarding the government's evidence and adopting the defendant's after-the-fact gloss on what happened the day of his arrest. Such practice blocks a sound disposition in this case.

At the suppression hearing, the government called two FBI agents as witnesses to demonstrate the voluntariness of the consents given by Mrs. Maez to search her home and auto. Special Agent Guyman testified, in part, that when he first spoke to Patsy Maez, he explained to her that her husband was being placed under arrest and charged with a bank robbery which had occurred earlier that afternoon. He told her that her husband matched the description of the robber and a vehicle belonging to him had been used in the robbery.

In response to counsel's question: "Can you describe how she reacted and responded to you?" Special Agent Guyman testified:

> She had indicated that there was no problem that we would be going to search the trailer. She had indicated that the trailer belonged to her and it was in her possession. In essence what I did is I filled out the search form and had her read it out loud to me and then she signed it.

He further testified: "She read it out loud to me and she did not have any questions.... It appeared to me that she understood." The agent's testimony is bol-stered by the defendant's testimony. As to the search of the mobile home, the defendant testified that he left the decision as to consent up to his wife. "I told her 'Well, it's your trailer. It's up to you,' and I shook my head up and down, to go ahead if she wanted to, because the trailer is under her name."

The consent form which Patsy Maez signed reads as follows:

> <u>8/14/87</u>
> (date)
> <u>ALBUQUERQUE</u>
> (Location)
>
> I, <u>PATSY ANN MAEZ</u>, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize <u>SA CALVIN E. GUYMAN</u>, and <u>JOSE A. MARRERO</u>, Special Agents of the Federal Bureau of Investigation, United States Department of Justice, to conduct a complete search of my premises located at <u>9600 CENTRAL SW SPACE 41</u>. These agents are authorized by me to take from my premises any WEAPONS & MONEY, letters, papers, materials or other property which they may desire.
>
> This written permission is being given by me to the above-named Special Agents voluntarily and without threats or promises of any kind.

At the suppression hearing, the government introduced and the court received the executed consent form into evidence.

Special Agent Marrero testified regarding Patsy Maez' consent to search the vehicle. He stated, in part, as follows:

A She was in the mobile home throughout the search.

Q Were you able to tell during the times that you observed her, did she appear to be—could you describe how she appeared? Did she appear frightened, et cetera?

A She did not appear frightened. She appeared I would say sad, and if I may say so she had a resigned look about her as far as—somehow I got the feeling

that what was happening was not a total shock to her, but it was an unpleasant experience for her.

Inside the Maez trailer home, Special Agent Marrero again advised Patsy Maez that she was not under arrest and was under no obligation to talk to the agents. When asked if she would consent to a search of her vehicle, "[s]he agreed to the search and without her asking questions we did explain to her that she was under no obligation to give the consent, though she didn't ask any questions relating to the consent." "I showed it to her. I read it to her and I had her read it." Patsy Maez executed a consent to search her vehicle as well as her home.[1]

On cross-examination, Special Agent Marrero was asked: "So would it be fair to say your assignment was to accompany Ms. Maez, Mrs. Maez so that she would sign a consent to search form?" Special Agent Marrero responded:

No. My assignment was to accompany her and explain to her if she, not so that she would, but rather if she would. My assignment wasn't to make her sign the consent. My assignment was to help her understand what the consent entailed and it was totally up to her whether or not she signed it.

When asked if she had cried, Special Agent Marrero testified: "[S]he might have had a tear in her eye, but she wasn't, she hadn't broken down into tears or anything like that. She wasn't uncontrollably crying and sobbing and all this. She was just sitting there minding her child." When asked if he questioned Patsy Maez about the bank robbery itself, Special Agent Marrero responded: "My conversation with her was limited to making sure that she was comfortable. Would you like some water, she said yes. Is the baby getting heavy, can I help you in any way, that sort of thing, but not relating to the investigation...."

Mrs. Maez testified that she signed the consent to search forms because she felt she "had to." She stated she was "scared and upset and angry" during the whole procedure, but that she was not crying. On cross-examination the government brought out the facts that Mrs. Maez had worked for the New Mexico Department of Human Services for nineteen years, and that currently she was a clerk-specialist. In the past she had been a notary public. She testified that she knew her husband had been in the penitentiary "[a]bout four times" during their sixteen-year marriage.

In my view the record portrays a scene that is far removed from the thundering drama of police abuse depicted in the majority opinion. Patsy Maez is a literate woman who has held a government position for nineteen years. She has endured a marriage to a man who has been in and out of incarceration. In the bank robbery of the instant case, Arthur Maez was identified as the man who used a firearm to knock unconscious a female bank employee. He admitted to an FBI agent that at the time of his latest arrest, he was using heroin approximately three times per week. One wonders who Patsy Maez was afraid of and angry with during the arrest of this man. I believe we make a mistake when we substitute our perception of the facts for that of the trial court.[2]

Likewise, I cannot accept the majority's interpretation of the record as to the consent to search and the statements given by Arthur Maez while in custody. Special Agent Garay testified that he advised the defendant of his constitutional rights orally when he was taken into custody at 7:15 p.m. The defendant was then transported to the FBI office in Albuquerque. Until that point, there had been no conversation between the defendant and the agent.

At the FBI office, Special Agent Garay *again* advised Arthur Maez of his constitutional rights. Forty-five minutes after his

---

**1.** Although no evidence was seized pursuant to this consent, in the context of the whole record, this consent is relevant to show Patsy Maez' persistence in consenting to searches.

**2.** In determining the voluntariness of the consents and statements, the trial judge must determine the impact of the illegal arrest on Patsy and Arthur Maez, not its impact on our sensibilities.

arrest, the defendant read aloud the advisement of rights and executed a waiver identical to the one executed by his wife. Additionally, the defendant read aloud and executed a consent to search his pickup truck. Both of these documents were admitted into evidence at the suppression hearing. Special Agent Garay agreed with counsel that the defendant appeared "to be aware of what was going on" when he was interviewed. The defendant was a man with an extensive criminal record, appeared to understand his rights, and did not appear to be confused or frightened during the interview. Although the defendant vomited three-quarters of the way through the interview, Special Agent Garay testified that he was trained to recognize symptoms of persons who are under the influence of drugs, and that the defendant appeared to have control of himself. Deputy Pacheco of the Bernalillo County Sheriff's Department testified in part:

Q And that he told you he had taken two valiums?

A Yes.

Q Did he tell you he had taken any other medication or drugs that evening?

A He was asked if he was under the influence of heroin and he said no. Any other drug and he said no. He vomited after he drank the water that we gave him.

Many of these facts are not noted in the majority's opinion. Again, the majority substitute their perception of the facts for that of the trial court.

What troubles me as much as the majority's perception of the facts, however, is the majority's application of legal principles to produce an outcome which is both unwarranted and unwise. The questions presented for review are whether the consent to search given by Patsy Maez to the FBI was voluntary in fact so as to remove the taint of Arthur Maez' unlawful arrest, and whether Arthur Maez' consent to search and in-custody statements were sufficiently acts of free will to purge the taint of his illegal arrest. Majority op. at 1453, 1456, 1457. I do not agree with the majority's

disposition of the case or with its usurpation of the trial court's function.

The majority notes that the district judge found that Patsy Maez' consent was voluntarily and willingly given. The district judge observed:

And I will find that while the circumstances may have been tense and while the environment may not have been that of the most ideal for considering the signing of a permission to search, that nevertheless she voluntarily and willingly gave the officers a permission to search....

Contrary to the majority's contention that the district judge "expressed reluctance in making this finding," majority op. at 1454, I interpret the comments as recognizing the fact that one can give consent voluntarily even under circumstances which are less than conducive to thoughtful reflection. Experience teaches us that commonly, when suspects and/or family members waive constitutional rights and give information to law enforcement officers, the setting is less than pastoral. In this case, I have no doubt that Patsy Maez voluntarily consented to the search of her mobile home. In spite of the illegal arrest, if asked to do so, I would be inclined to hold that the evidence demonstrates her consent was strong enough to overcome the illegality of her husband's arrest. Similarly, I would be inclined to hold that Arthur Maez' waiver of *Miranda* rights and consent to search under the circumstances of this case overcame the illegality of the arrest.

The majority correctly concludes that whether a consent to search preceded by a Fourth Amendment violation is sufficiently an act of free will to purge the primary taint of the illegal arrest depends on whether it is voluntary *in fact*. The trial court, although incorrectly opining that the arrest was lawful, did hold a factual hearing and determined that the consents and statements were voluntary. In reviewing a denial of a motion to suppress, the trial court's findings must be accepted by this court unless they are clearly erroneous. *United States v. Guglielmo*, 834 F.2d 866, 868 (10th Cir.1987) (citing *United States v.*

*Cooper,* 733 F.2d 1360, 1364 (10th Cir.), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984); *United States v. Gabriel,* 715 F.2d 1447, 1450 (10th Cir. 1983)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), *cited in, e.g., Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Everaard v. Hartford Accident and Indem. Co.,* 842 F.2d 1186, 1191 (10th Cir.1988). "Questions of fact are reviewed under the deferential, 'clearly erroneous' standard as set forth in Fed.R.Civ.P. 52(1). Although the standard is a rule of civil procedure, it is applied to certain issues in criminal proceedings." *United States v. Ortiz,* 804 F.2d 1161, 1164 n. 2 (10th Cir.1986). "If findings are not made, this court must uphold the ruling if there is any reasonable view of the evidence to support it." *United States v. Fountain,* 776 F.2d 878, 884 (10th Cir.1985) (citing *Anderson,* 470 U.S. 564, 105 S.Ct. at 1506); *Colon–Sanchez v. Marsh,* 733 F.2d 78 (10th Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984); *Cooper,* 733 F.2d at 1364).

On appeal, the evidence must be viewed in the light most favorable to the district court's findings. *Guglielmo,* 834 F.2d at 868 (citing *United States v. Lopez,* 777 F.2d 543 (10th Cir.1985)). *See also United States v. Freeman,* 816 F.2d 558, 561 (10th Cir.1987). Stated differently, the reviewing court must consider the evidence in the light most favorable to the government. *United States v. Ashby,* 864 F.2d 690, 692 (10th Cir.1988); *United States v. Jimenez,* 864 F.2d 686, 688 (10th Cir.1988); *United States v. Soto–Ornelas,* 863 F.2d 1487, 1490 (10th Cir.1988); *United States v. Smith,* 797 F.2d 836, 840 (10th Cir.1986).

Where a motion to suppress is heard, the credibility of the witnesses, the weight to be given the evidence, and the drawing of inferences are for the trial judge. *Fountain,* 776 F.2d at 879 (citing *Cooper,* 733 F.2d at 1374). Although in footnotes 13

and 15 the majority cites the *United States v. Grier,* 866 F.2d 908, 935 (7th Cir.1989), a proper use of that case demands that we pay attention to the full quotation therein. The Seventh Circuit case utilized by the majority states the law as I urge herein and which has been set forth in numerous cases of our own circuit. In *Grier,* the court said:

"A district court's denial of a motion to suppress evidence will be affirmed on appeal unless it is clearly erroneous. We will rely on the district court's findings of fact absent a showing of clear error. This standard applies to the district court's findings on the credibility of witnesses, findings that will not be reversed unless clearly erroneous. 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)."

(Quoting *United States v. D'Antoni,* 856 F.2d 975, 978–79 (7th Cir.1988)). Furthermore, I am not left with the definite and firm conviction that a mistake has been committed by the trial judge as to his finding of voluntariness. In *Lone Star Steel Co. v. United Mine Workers of America,* 851 F.2d 1239, 1242 (10th Cir.1988), we applied the concept: "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (Citing *United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949)). Obviously, there are at least two permissible views of the evidence. For these reasons, I would not overturn the trial court's findings that the consents and statements were voluntary.

Furthermore, I cannot agree with the procedure used by the majority to effect its

result. The majority chose to "take the bull by the horns," conduct a taint analysis, and suppress the evidence in this case. Such initiative is particularly inappropriate in this case. Based upon the cold slab of a transcript, different readers conjure entirely different scenarios. The trial judge, and only the trial judge, is in a position to discern the truth in a case like this. Resolution of the issue of voluntariness in this case turns on the credibility of the witnesses. Only the trial judge can assess the credibility of participants reliably. The majority does not even address whether the trial judge's findings are "clearly erroneous," and yet disregards the findings and renders an opposite result. With all due respect to my fellow appellate judges, there are times when we should "mind our own business," and this is one of those times. In my view, we should remand for further proceedings consistent with our holding as to the *Payton* violation. After the trial court is given an opportunity to assess the facts in light of the *Payton* violation, then, if the case returns to us, we should review the findings under the "clearly erroneous" standard of review.

Citing *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the majority footnotes the concept that "where the proceedings below 'resulted in a record of amply sufficient detail and depth from which the determination may be made,' the appellate court may conduct a taint analysis." Majority op. at 1454 (quoting *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262). This is not a case in which that procedure is appropriate. In *Brown,* the Court noted that the illegality "had a quality of purposefulness. The impropriety of the arrest was obvious...." *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262. Remand in *Brown* would have resulted in mechanical disposition of the case. Such is not true in the instant case, and consequently I must dissent.