**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Tommy Charles FOUNTAIN, Jr.,
Defendant-Appellant.**

**No. 83–2110.**

United States Court of Appeals,
Tenth Circuit.

Oct. 30, 1985.

* The Honorable James M. Ideman, United States District Judge for the Central District of California, sitting by designation.

Allan DeVore of Evans & DeVore, Oklahoma City, Okl., for defendant-appellant.

James F. Robinson, Asst. U.S. Atty. (William S. Price, U.S. Atty., with him on brief), Oklahoma City, Okl., for plaintiff-appellee.

Before SETH, BARRETT, and SEYMOUR, Circuit Judges.

BARRETT, Circuit Judge.

Tommy Lee Fountain (Fountain), appeals his conviction following trial to the court based on stipulated facts and documents, of knowing, intentional and unlawful conspiracy with some six named co-conspirators and others unknown, to distribute and for distributing tablets of Dilaudid, a Schedule II narcotic controlled substance, in violation of 21 U.S.C. § 841(a)(1). The crux of the charge was that commencing November 13, 1978, and continuing to about February 5, 1981, fraudulent, forged prescriptions for quantities of Dilaudid were filled and distributed by Fountain, a licensed pharmacist, employed by Heritage Park Pharmacy of Midwest City, Oklahoma, located near the City of Tulsa. The Dilaudid tablets were thereafter sold at substantial sums. The trial court, at sentencing, observed that Dilaudid is "[o]ne of the most powerful and addicting and destructive of the drugs that are abused, and who knows better about that than a pharmacist." (R., Vol. V, p. 6.)

On appeal, Fountain contends that the district court erred in denying his pre-trial motion to suppress his confession on the grounds "[T]hat the defendant was promised by Jim Willis and Jim Puckett that they would and could obtain immunity for the defendant and that the defendant was subjectively under the expectation of immunity when his statements were given, based on the promises ... the promises of immunity did overbear the defendant's will to resist and brought about a confession which was not freely self-determined."

(R., Vol. I, pp. 6, 7.) Fountain contends that his confession and all fruits thereof should have been suppressed because his confession was involuntarily given. In the alternative, he argues that because he fully cooperated with the Government in the drug investigation that the immunity agreement he allegedly struck with the Government should be enforced. In response, the Government contends that Fountain was not granted or promised immunity or, if an implied promise was found to have been made by the Government, Fountain violated it by failing to cooperate with the Government fully.

A recital of relevant facts in the record will be made keeping in mind that in reviewing a denial of a motion to suppress, the trial court's finding of fact must be accepted by this court unless clearly erroneous. *United States v. Recalde*, 761 F.2d 1448, 1457 (10th Cir.1985); *United States v. Pappas*, 735 F.2d 1232, 1233 (10th Cir. 1984) (also holding that at a hearing on motion to suppress, credibility of witnesses and weight to be given evidence together with inferences, deductions and conclusions to be drawn from evidence, are to be determined by the trial judge); *United States v. Cooper*, 733 F.2d 1360, 1364 (10th Cir.1984) (credibility determinations are for the finder of fact, that is, the trial judge); *United States v. Obregon*, 748 F.2d 1371, 1376 (10th Cir.1984) (the evidence must be viewed in the light most favorable to the district court's finding); *United States v. Gabriel*, 715 F.2d 1447, 1450 (10th Cir. 1983); *United States v. Axselle*, 604 F.2d 1330, 1335 (10th Cir.1979) (where a motion to suppress is heard, the credibility of the witnesses, the weight to be given the evidence, and the drawing of inferences are for the trial judge).

In 1981, the Oklahoma State Bureau of Narcotics and Dangerous Drugs (OSBNDD) commenced an audit of Fountain's pharmacy following receipt of information that large quantities of Dilaudid were leaving the pharmacy. The primary investigative agent was Agent James Thomas Puckett (Puckett), assisted by

Agents James Willis and Charles Wright. Fountain was aware of the investigation. Fountain, a registered, licensed pharmacist, obtained his degree following five years of college. The evidence adduced at the pre-trial evidentiary hearing on the motion to suppress Fountain's confession document-ed by his handwritten statement and a sub-sequent typewritten statement involved the testimony of Fountain and his girlfriend, Ms. Gail Bryner and Government witnesses Agent Puckett and Agent James Ford, a polygraph expert. The court, following the hearing, entered its order denying Foun-tain's motion to suppress. The evidence presented at the hearing, supplemented by the stipulated facts, revealed, *inter-alia,* that:

Agents Jim Willis and Jim Puckett served with the Oklahoma State Bureau of Narcotics and Dangerous Drugs (OSBNDD); in 1981 Agent Puckett con-ducted an audit of Fountain's pharmacy because of information that a large amount of dilaudid was leaving the phar-macy; Fountain asked to meet with the agents; a meeting was arranged and Fountain stated to the agents that he could provide information relative to criminal activities concerning drugs but that he would require a grant of immuni-ty from prosecution in return; *Agent Puckett advised Fountain that immu-nity could only be granted by the Unit-ed States Attorney;* Fountain terminat-ed the meeting without making any in-criminating statements;

A second meeting was held at Foun-tain's request and again Fountain in-quired about immunity from prosecution; *once again Agent Puckett advised Fountain that only the United States Attorney could grant him immunity and if so the condition would be his full cooperation with the Government;* the second meeting concluded without Foun-tain having made any incriminating statements;

A third meeting was initiated by Foun-tain; Agent Puckett, upon inquiry from Fountain, related that it would be reason-able for a defendant to anticipate the grant of immunity from prosecution if he fully cooperated with the Government's investigation; *but he could not grant immunity;*

A fourth meeting was held, at Foun-tain's request, at OSBNDD headquarters with Agent Puckett and other agents; Fountain did not make any inquiry about immunity from prosecution, but Fountain did, prior to making any statements, ob-tain full advisements and sign a form entitled "Statement of Rights and Waiv-er" containing full *Miranda* advise-ments, including acknowledgment that no promises or threats had been made to him and no pressure of any kind used against him; Fountain then wrote out a "Voluntary Statement" witnessed by Agents Puckett and Willis, detailing the unlawful distribution of controlled sub-stances involving himself and those he associated with;

Shortly thereafter, Fountain traveled from Tulsa to Oklahoma City where he executed a typewritten version of hand-written statement, which, when correct-ed, was executed by Fountain on a form entitled "Voluntary Statement";

Thereafter, OSBNDD agents request-ed that Fountain travel to Oklahoma City from Tulsa to submit to a polygraph examination; Fountain did so; the poly-graph examiner (Agent Ford) was unable to obtain conclusive results because, in the opinion of the examiner, Fountain had purposefully manipulated his move-ments and breathing in an effort to de-feat the test and had likely taken some drugs to achieve this result; the agents requested that Fountain return for a fur-ther polygraph examination in Oklahoma City by the same examiner, but Fountain refused to do so;

There were no further contacts or com-munications between OSBNDD agents and Fountain; the agents were of the view that Fountain was uncooperative in the investigation.

The trial court's Order denying the mo-tion to suppress, after reciting the facts

substantially as above related, stated, *inter-alia:*

In determining whether a defendant's confession is obtained in contravention of the defendant's privilege against self-incrimination, the test is not whether the state's agents' conduct is shocking, but whether the confession was free and voluntary in the sense that it was not extracted by threats or violence and it was not obtained by direct or implied promises or by the exertion of any improper influence. *Malloy v. Hogan,* 378 U.S. 1 [84 S.Ct. 1489, 12 L.Ed.2d 653] (1963); *Brady v. United States,* 397 U.S. 742 [90 S.Ct. 1463, 25 L.Ed.2d 747] (1970). See also, *Hutto v. Ross,* 429 U.S. 28 [97 S.Ct. 202, 50 L.Ed.2d 194] (1976).

In the case at hand, the defendant had an arguable basis for believing that he would be vested with immunity from prosecution *provided* that he fully cooperate with the requests of the Government's investigators. As such, his agreement was executory in nature. At the time the defendant made his statements, he knew that no immunity had been granted to him. Further, he knew that under the terms of his perceived agreement immunity would not be forthcoming if he failed to continue to fully cooperate with the Government's investigation. Consequently, and under the particular facts of this case, the question is whether the defendant is entitled to the benefit of the bargain as he perceived it.

While the defendant may seek to rationalize his failure to fully cooperate with the OSBNDD as minor procedural disputes, there did come a time when, as viewed through the eyes of the OSBNDD agents, the defendant adopted an obstructionist position to the pending investigation and placed additional conditions upon his further cooperation with the OSBNDD requests. As such, the OSBNDD was justified in determining that the defendant was not fully cooperating in the investigation.

(R., Vol. I, pp. 62, 63.)

In conclusion, the trial court found:

*The defendant was fully advised that the OSBNDD agents with whom he dealt were unauthorized to extend him a grant of immunity from prosecution and he was never advised that such a grant of immunity had been made.* Nevertheless, the defendant was led to believe that a grant of immunity would be forthcoming upon his compliance with certain conditions precedent. Inasmuch as the defendant failed to comply with the bargain as he perceived it, he cannot now obtain the benefit thereof.

*Id.* at 64. (Emphasis supplied.).

During the hearing on the motion to suppress, Agent Puckett testified on cross examination in part as follows:

Q. What was the discussion that you purportedly had with Mr. Fountain regarding him being an unindicted co-conspirator or something of that nature? Was that ever brought up?

A. He asked in our conversations how the Government worked immunity, and we explained, said it was different ways. Some people are granted, you know, unindicted co-conspirator status or whatever you want to call it. Some people are not indicted at all. Some people are indicted.

I said, "That's not our decision. It's going to be the final decision of the U.S. Attorney's office."

Q. As a matter of fact, he [Fountain] was very concerned about having immunity in this case, wasn't he?

A. Extremely so, yes.

Q. Extremely so. As a matter of fact, it took you three meetings with him before he would give you any type of specific information because he wanted to have immunity first; isn't that correct?

A. He initiated all those meetings, yes, sir.

Q. But the purpose of him not giving you the information before was because he wanted to have immunity first; isn't that correct?

A. And we told him we could not grant him that immunity.

(R., Vol. III, pp. 30, 31.)

Agent John James Ford of the OSBNDD administered the polygraph examination of Fountain. He had previously administered some 350 tests. He testified that Fountain had attempted to circumvent the polygraph. (R., Vol. III, pp. 44–49.)

Fountain testified, *inter-alia*, that: He signed the statement forms and waivers because he was told this was necessary to receive immunity and "they" had promised him immunity (Vol. III, p. 59); Fountain did initiate each of the meetings with Agent Puckett and other agents; at the first meeting Fountain requested immunity for his statement and was told that "they" couldn't confer immunity but would "get back with me" (*Id.* at 60); about a month later Agent Puckett phoned Ms. Bryner and another meeting was held at which time Fountain again stated that he wanted immunity from prosecution for his statement and that at this time "they" offered him immunity if the information was useful (*Id.* at 61), but that the immunity had to come through the United States Attorney's office (*Id.* at 62); at the third meeting, involving Fountain, Ms. Bryner, Agent Puckett and Agent Willis, Agent Puckett told Fountain that he had obtained approval from the U.S. Attorney to grant him immunity if Fountain cooperated "with them" one hundred percent (*Id.* at 62); Fountain had not given the agents any specific information until he believed he was granted immunity and afterwards he told the agents about specific false, bogus prescriptions implicating others and he believes that he cooperated fully (*Id.* at 65, 66).

On cross-examination, Fountain stated that: he was a registered, licensed pharmacist in Oklahoma and he obtained a degree following five years of college (*Id.* at 68); he read the documents and signed them knowing he had waived his right to counsel, to remain silent with knowledge that he was entitled to an attorney and that anything he said could be used against him in court or other proceeding, and that the statement was made without threat, coercion, offer of benefit or offer of favor (*Id.* at 71, 72); he did not personally talk with anyone in the office of the United States Attorney in Oklahoma City regarding the grant of immunity in return for his testimony (*Id.* at 73, 74); that Agent Puckett stated that he had talked with the United States Attorney and that he would be granted immunity if he cooperated one hundred percent in the investigation (*Id.* at 75).

On redirect examination, Fountain stated that although a form he signed states that he requested a polygraph examination, he really did not do so, and although the documents he signed containing his statements recite that he waived his rights, he really did not believe he was doing so. *Id.* at 76.

Ms. Gail Bryner, a girlfriend of Fountain's, testified that she was present with Fountain at each of the aforesaid three meetings and that: at the first meeting the agents stated that they would have to talk with the Attorney General relative to grant of immunity to Fountain (R., Vol. III, p. 79); at the second meeting, at her house, Fountain asked if he could be granted immunity and Agents Puckett and Willis stated that they would have to talk to the U.S. Attorney and if the U.S. Attorney granted immunity it would depend on Fountain's one hundred percent cooperation (*Id.* at 80, 81); at the third meeting, in Agent Puckett's office, she believes that Puckett stated that the U.S. Attorney had approved the grant of immunity to Fountain if he cooperated (*Id.* at 82–84). Upon cross-examination, Ms. Bryner testified that the grant of immunity promised at the third meeting was something in the future, dependent upon Fountain's one hundred percent cooperation. (*Id.* at 87.)

Agent Puckett was recalled to testify. He stated, *inter-alia:*

A. Mr. Fountain asked specifically if we had granted him immunity, which we can't do, and we explained that to him. He asked again, can we—"Would I get immunity if I did everything you asked?

You know, if I went down the line and testified in all of the things that the Government asked, would I have immunity?"

I said "A logical man would assume that if you did everything that the Government asked you to do, that the Government would have to give you immunity. It's only logical." I said, "I don't think we can back out on something like that."

Q. Okay. Is this something that—a practice that you have done in the past on other cases?

A. Yes, sir.

Q. Have you talked to the U.S. Attorney's office in other cases about non-prosecution of certain individuals who co-operated in cases.

A. Yes, sir.

Q. And did you talk to the U.S. Attorney's office with respect to Mr. Fountain.

A. Yes, sir.

Q. Who did you talk to?

A. You, sir.

Q. What did we discuss?

A. We discussed that there would be no offers of immunity until we found out what Mr. Fountain would tell us in detail and what he would be able to help the Government with.

Q. Do you, in the course of your endeavors and investigations, offer immunity to individuals before you know what they can do for the Government?

A. No, sir.

Q. Was immunity every offered to Mr. Fountain in this case?

A. No, sir.

Q. Did you explain this to him?

A. Yes, sir.

(*Id.* at pp. 90, 91.)

The trial court then conducted inquiry of Agent Puckett, as follows:

THE COURT: Mr. Puckett, did you ever assure Mr. Fountain, by any comment or remark that you ever made to him, that you had discussed the matter with the United States Attorney or one of his assistants and had approval for the granting of immunity if he cooperated a hundred percent?

THE WITNESS: No, sir.

THE COURT: You've heard him testify to that effect, have you not?

THE WITNESS: Yes, sir.

THE COURT: Understanding his testimony, do you state specifically to me that you disagree with that and that is an untrue statement?

THE WITNESS: Yes, sir.

THE COURT: You understand the rather fine distinction that I'm making between your version and his, do you not?

THE WITNESS: Yes, sir.

THE COURT: That being that the person with authority to grant immunity, the U.S. Attorney or one of his assistants, had been contacted by you and that you had his approval, or words to that effect, that you could transmit to Mr. Fountain and assure him that the person with authority could and would grant him that immunity if the conditions of cooperation were met. That's what his testimony was.

THE WITNESS: Yes, sir.

THE COURT: And are you denying that? Denying having said that to him?

THE WITNESS: Yes, sir.

(R., Vol. III, pp. 93, 94.)

Following argument of counsel on the motion, the court observed that there exists conflicting testimony and difficult issues to be resolved. The court took the matter under advisement. On June 10, 1983, the court denied the motion to suppress per Order, *supra.* The defendant then waived a jury trial and the parties submitted the case to the court based upon a stipulation of facts and documents.

The court thereafter, per Memorandum Opinion and Order, found defendant Fountain guilty of Count I of the indictment, i.e., that he knowingly and willfully conspired with others to distribute a schedule II controlled substance in violation of 21 U.S.C. § 846, and knowingly committed at least one overt act in furtherance of the object

of the conspiracy. (R., Vol. I, pp. 187, 188.) On August 25, 1983, the court sentenced Fountain to the custody of the Attorney General for imprisonment for a term of three years. (R., Vol. II, p. 7.)

## I.

Fountain contends that the trial court erred in not granting him immunity, having found that there was an "arguable basis" for his claim that he was promised immunity. (Appellant's Brief, p. 5.) The difficulty with Fountain's contention on appeal, however, is that this contention involves a dispute of fact and that the trial court, as the trier of fact, found against Fountain. The trial court found, in effect, that if the agreement had been struck with the Government, as contended by Fountain, that his immunity from prosecution was conditional upon his full cooperation with the requests made of him by the Government's investigators, and, as such, "[h]is agreement was executory in nature." (R., Vol. I, p. 63.) The trial court then found that Fountain was not entitled to the benefit of the bargain "as he perceived it" because he failed to fully cooperate in the investigation. *Id.*

In *United States v. Hembree,* 754 F.2d 314 (10th Cir.1985), where an informal grant of immunity had in fact been struck between the defendant and the United States Attorney based upon Hembree's agreement to testify truthfully at a trial, we held that the agreement was simply a contract and that Hembree did not satisfy her part of the immunity agreement. The issue of performance or breach is a fact issue. Thus, in *Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir.1982), the court stated, *inter-alia:*

> The only evidence in the record going to Rowe's lack of good faith is testimony indicating that Rowe perjured himself when he testified before the state grand jury and in state trials. Such evidence, if credited, would remove from the state any obligation to uphold the promise of immunity.

■ Here, there were conflicting versions of the facts relating to the issue of grant of immunity; thus, the trial court, as the trier of fact, determined the question of credibility. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Assuming, for purposes of resolving this issue, that there was an agreement struck with the Government as perceived by Fountain, the trial court found that Fountain failed to perform his part of the bargain. This finding is well within the fact-finding process of the trial court. The appellant has failed to demonstrate that the trial court's findings are clearly erroneous; therefore, they are binding upon this court. *Anderson v. City of Bessemer City, N.C.,* — U.S. —, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Colon-Sanchez v. Marsh,* 733 F.2d 78 (10th Cir.1984); *United States v. Cooper,* 733 F.2d 1360, 1364 (10th Cir.1984) (the standard of review for denial of a motion to suppress is clear—the findings of fact must be accepted by the court unless clearly erroneous. If findings are not made, this court must uphold the ruling if there is any reasonable view of the evidence to support it.... Credibility determinations are for the finder of fact, that is, the trial judge. *Id.*)

## II.

Fountain next contends that even if he was not entitled to a grant of immunity, his handwritten and typewritten confessions were inadmissible because they were involuntarily made as a result of a direct or implied promise of immunity. Fountain quotes *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961) for the proposition that his confession was not voluntarily given:

> The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question of whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth....

A defendant has the right to be tried according to the substantive and procedural due process requirements of the Fourteenth Amendment. This means that a vital confession, such as is involved in this case, may go to the jury only if it is subjected to the screening in accordance with correct constitutional standards.

It is well established that the Fifth Amendment's privilege against self-incrimination prohibits the admission of incriminating statements obtained by Government acts, threats or promises which permit the defendant's will to be overborne and thus rendered involuntary. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), *reh. denied,* 372 U.S. 950, 83 S.Ct. 931, 9 L.Ed.2d 975 (1963). In *Shotwell* the critical issue was whether incriminating disclosures should have been suppressed on the ground of immunity. The individual defendants, officers of Shotwell, contended that their incriminating disclosures were not given freely and voluntarily because they were obtained by direct or implied promises of immunity. Thus, the same contention was advanced there as that before us in the instant case. The Supreme Court revisited *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) for the rule that the prosecution must establish a defendant's guilt by evidence independently and freely secured without coercion or inducement from a person under a governmental promise of immunity, citing to *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897). The *Shotwell* court held that no inducement or coercion had occurred and stated, *inter-alia:*

A coerced confession claim, whether founded on a promise of immunity or otherwise, always involves this question: did the governmental conduct complained of "bring about" a confession "not freely self-determined"? *Rogers v. Richmond, supra,* at 544 [81 S.Ct. at 741]....

\* \* \* \* \* \*

[P]etitioners' position is not like that of a person, accused or suspected of crime, to whom a policeman, a prosecutor, or an investigating agency has made a promise of immunity or leniency in return for a statement. In those circumstances, an inculpatory statement would be the product of inducement, and thus not an act of free will.

371 U.S. at 348, 83 S.Ct. at 453.

■ In the instant case, there is no evidence that the United States Attorney's office knew of the alleged implied promise of immunity extended by Agent Puckett. Most significantly, the record shows that each contact with Agent Puckett was initiated by Fountain and that on each occasion, defendant Fountain was pointedly and specifically advised that immunity from prosecution could not be granted by the agents and *only* by the office of the United States Attorney and then only upon the condition of the defendant's one hundred percent cooperation. There is no allegation or assertion that Mr. Fountain misunderstood the clear, unequivocal advisements that immunity from prosecution could *only* be granted by the United States Attorney or that he was induced to confess, misled, confused, pressured or coerced. Mr. Fountain knew precisely who he was to contact in order to obtain immunity, but he did not at any time contact the United States Attorney or his assistants. Even at the third meeting initiated by Mr. Fountain when he asked Agent Puckett whether he had been granted immunity, Agent Puckett again stated in a straightforward manner that he could not grant Fountain immunity. It was in this setting that Fountain inquired of Agent Puckett whether his complete cooperation in the investigation (he had already indicated that he was aware of the scheme behind the prescriptions) would earn him immunity. It was in this context that Agent Puckett honestly stated that it could be assumed that the "Government" would grant Fountain immunity if he cooperated fully.

It cannot be fairly said that given the various contacts, each initiated by Fountain

and the consistent advisements by Agent Puckett, that the conduct of Government officials induced or brought about Fountain's confession. There is nothing in the record which indicates that Fountain was not well-educated, knowledgeable or intelligent. Agent Puckett was a law enforcement officer undertaking a specific drug investigation. His status and role was known to Fountain. Agent Puckett, who did not suggest or initiate the meetings with Fountain, did not practice deceit or trickery—his advisements to Fountain relative to immunity and who was authorized to grant it were consistent, true and easily understood. They veritably constituted warnings against self-incrimination. Under these circumstances, it is ludicrous to suggest that Agent Puckett should have maintained a "hands off" policy in respect to the three contacts initiated by Fountain.

On March 4, 1982, Fountain executed a "Statement of Rights and Waiver." He signed a "Voluntary Statement" July 8, 1982, wherein Fountain described his illicit drug trafficking of Dilaudid, HCL, with Tom Stanley, Dee Pierce, Marilyn Pierce, Guy Dodson, and Teresa Dodson. The "Voluntary Statement" included this provision:

> "I make this statement voluntarily, of my own free will, knowing that such statement could later be used against me in any court of law. I declare that this statement is made without any threat, coercion, offer of benefit, favor or offer of favor, leniency, offer of leniency by any person or persons whomsoever. ..."

(R., Vol. I, p. 43; Govt's Exhibit C.) The confession was made freely and voluntarily in keeping with *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

There is no contention that Fountain was "in custody" when he made the confession. Even so, he received the full *Miranda* warnings. There is no showing that the confession was not freely and voluntarily given. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). We have held that voluntariness is the sole constitutional requisite governing the admission of a confession in evidence, and that the burden cast on the Government when the defendant first presents evidence in support of his motion to suppress is to establish voluntariness by a preponderance of the evidence. *United States v. Crocker,* 510 F.2d 1129 (10th Cir.1975); *United States v. McCormick,* 468 F.2d 68 (10th Cir.1972), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1361, 35 L.Ed.2d 588 (1973); *United States v. Ireland,* 456 F.2d 74 (10th Cir.1972). A defendant's act of signing a waiver form prior to confession, though not conclusive, is "usually strong proof" of the voluntariness of the waiver. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *United States v. Smyer,* 596 F.2d 939 (10th Cir.1979); *Blasingame v. Estelle,* 604 F.2d 893 (5th Cir.1979).

It serves no real purpose to speculate why an educated, intelligent person such as Fountain would have waived his Fifth Amendment privilege. He contends *now,* following his prosecution and sentence, that he did so in the belief that the Government had granted him complete immunity from prosecution in return for his testimony and cooperation. We hold the district court acted properly in admitting Fountain's confessions into evidence. The district court was not clearly erroneous in finding that the confessions were voluntarily made.

**WE AFFIRM.**

SEYMOUR, Circuit Judge, concurring.

I concur fully in the majority's persuasive analysis of the voluntariness of Fountain's confession. However, I would not reach the question of immunity from prosecution because I do not believe that it was properly raised.

A prosecutor retains the discretion to promise transactional immunity to secure testimony evidence, or other cooperation from a potential defendant, *United States v. Brimberry,* 744 F.2d 580, 586 (7th Cir. 1984); *Rowe v. Griffin,* 676 F.2d 524, 527 (11th Cir.1982), and due process may require the enforcement of such an agree-

ment under certain circumstances, *see Brimberry*, 744 F.2d at 586 & n. 6; *Plaster v. United States*, 720 F.2d 340, 352 (4th Cir.1983); *Rowe*, 676 F.2d at 528; *cf. Mabry v. Johnson*, 467 U.S. 504, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984); *Santobello v. New York*, 404 U.S. 257, 261–62, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971). However, a motion to dismiss the indictment is the proper method of raising the issue. *Brimberry*, 744 F.2d at 586; *United States v. McDaniel*, 449 F.2d 832, 835 (8th Cir.1971), *cert. denied*, 405 U.S. 992, 92 S.Ct. 1264, 31 L.Ed.2d 460 (1972); *see also United States v. Strawser*, 739 F.2d 1226, 1228 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984). Fountain never filed a motion to dismiss the indictment; nor did he raise the issue at the suppression hearing. Accordingly, I would not decide whether due process requires the enforcement of Fountain's executory immunity agreement.