**UNITED STATES of America, Plaintiff,**

v.

**Raymond OLDMAN, Defendants.**

No. 2:00CR222.

United States District Court, D. Utah, Central Division.

July 10, 2001.

Felice Viti, Salt Lake City, UT, for Plaintiff.

Paul Gotay, for Defendants.

## ORDER

J. THOMAS GREENE, District Judge.

This matter is before the court on defendant Raymond Oldman's Motion to Suppress alleged confessions made in April 2000 in this District and in June 2000 in Illinois. The court heard evidence at an evidentiary hearing on March 8 and 9, 2001, and heard oral argument on the Motion to Suppress June 13, 2001. Having considered the motion, supporting and opposing memoranda, the argument of counsel for both parties and supplemental memoranda,[1] the court issues this Order.

### I. FACTUAL BACKGROUND

On May 17, 2000, an Indictment by Grand Jury was filed in this court, charging Raymond Oldman with two counts of aggravated sexual abuse of a child within Indian Country, and one count of witness tampering. The facts and circumstances surrounding the Indictment, both before and after, are the subject of the Motion to Suppress now before this court. The court therefore will consider these circumstances in some detail based on the evidence presented at the aforementioned evidentiary hearing.

On April 19, 2000, FBI Special Agent James Lyman ("Lyman"), Special Agent Todd Argyle and Deputy Sheriff Hank Lee, a task force officer with the San Juan County Sheriff's Office, visited Mr. Oldman ("Oldman") at his house in Aneth, Utah, on the Navajo reservation, to question him concerning allegations that he had molested his minor step-granddaughter between 50 and 100 times in the past. During a 10–15 minute interview of Mr. Oldman on his front doorstep, wherein Lyman told him of the allegations, Oldman denied that he had ever sexually abused the victim.[2] Upon informing Oldman that the FBI uses polygraphs as an investigatory tool and asking whether he would be willing to take a polygraph to determine whether he was telling the truth, Oldman agreed to meet at a future date, yet to be established. Lyman and Oldman tentatively discussed April 30 as a date for the polygraph examination, but agreed to get in touch with him once he talked to the polygraph examiner.

Sometime thereafter, Lyman contacted then Special Agent Joseph Cottis ("Cottis"), a polygraph examiner with the FBI, about scheduling to examine Oldman. After discussing the matter and after agreeing on a tentative date of April 27, 2000, Lyman contacted Oldman, who agreed to meet on that date, and the two agreed to have Lyman pick Oldman up at his house in Aneth at a pre-arranged time.

On April 27, Lyman picked up defendant sometime between 9:45 and 9:55 a.m. and took him to a federal law enforcement building in Montezuma Creek on the Navajo reservation. The trip took about 15 minutes, during which Lyman and Oldman talked about the polygraph test. Upon arriving, Lyman and Oldman met with Cottis in a room.[3] According to Lyman, Oldman never indicated that he did not want to take the polygraph and was not subject to either coercion or force at any time.

Upon settling in the room, Cottis explained the polygraph process to Oldman, stating that it involved certain steps.

---

1. At the end of the March 8–9, 2001, evidentiary hearing on the Motion to Suppress, and as later memorialized in an Order dated March 20, 2001, the court granted both parties leave to file contemporaneous briefs in this matter.

2. Mr. Oldman did say he had touched the victim, saying he had raised her, bathed her and changed her diapers, but otherwise denied the allegations.

3. The room used for the polygraph was 25 feet by 15 feet, fluorescent-lit, had two doors, a closet, a table and desk chairs.

Those steps are: 1) presentation of two forms constituting a notification of his rights and waiver of those rights (described in more detail below); 2) Lyman would leave and just the two of them (Cottis and Oldman) would attend the interview; 3) Cottis would ask Oldman some background questions concerning his birth, education, employment and general health; 4) Cottis would ask Oldman questions about the allegations made against Oldman; 5) Cottis and Oldman would develop the questions together that Cottis would ask during the polygraph; 6) they would run through a practice test so Oldman would become familiar with the test and be comfortable with it; and 7) Cottis would

then conduct the polygraph examination of Oldman. Oldman had no questions about the polygraph process and did not at any point indicate that he did not wish to take the polygraph.

After explaining the polygraph process to Oldman, Cottis presented him with two FBI forms. First, he showed him and explained form "FD328—Consent to Interview with Polygraph."[4] Oldman stated that he understood it and did not have any questions about it. Oldman signed the form on the "Examinee" line, after which Cottis signed as "Examiner" and Lyman signed the form as a witness. Next, Cottis showed Oldman the other form, "FD395—Interrogation; Advice of Rights."[5] Cottis

---

4. This is the entire form FD328, with handwriting in < >:

CONSENT TO INTERVIEW WITH POLYGRAPH

    PLACE: <Montezuma Creek Ut>
    DATE: <4–27–00>
    TIME: <10:13 AM>

Before we begin an examination by means of the polygraph in connection with <Callegation [sic] of sexual abuse of a minor> ⎯⎯⎯

you must understand your rights.

*YOUR RIGHTS*

    You have the right to refuse to take the polygraph test.

    If you agree to take the polygraph test, you have the right to stop the test at any time.

    If you agree to take the polygraph test, you have the right to refuse to answer any individual questions.

*WAIVER AND CONSENT*

    I have read this statement of my rights and I understand what my rights are. I voluntarily agree to be examined by means of the polygraph during this interview. I understand and know what I am doing. No threats or promises have been used against me to obtain my consent to the use of the polygraph. I understand that the examination room (~~DOES~~) (DOES NOT) contain an observation device and that the examination (~~WILL~~) (WILL NOT) be monitored or recorded.

      SIGNED <Raymond Oldman>
           (Examinee)
           <Joseph F. Cottis>

           (Examiner)
WITNESS: <James T. Lyman>

---

5. This is the entire form FD395, with handwriting in < >:

INTERROGATION; ADVICE OF RIGHTS

*YOUR RIGHTS*

    Place <Montezuma Creek, Ut
    Date <4–27–00>
    Time <10:15 AM>

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer any questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

*WAIVER OF RIGHTS*

    I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No

read it to Oldman, after which Oldman signed it without asking any questions. Cottis and Lyman signed it as witnesses.

After Cottis explained the forms and everyone signed the forms, Lyman left the room and Cottis obtained background information from Oldman. After that he explained the allegations against Oldman and they discussed those allegations. During the course of the questioning, Oldman confessed to having touched and inserted his finger in the victim's vagina, but denied allegations that he had done that many more times and that he had made her touch his penis.

Cottis and Oldman then developed the questions that would be used during the polygraph. After entering the questions into the polygraph computer, Cottis developed a practice test for Oldman. Once completed, Cottis told Oldman that he would then conduct the polygraph examination, that he would ask the questions in a different order, and that he might ask the questions more than one time.

Next, Cottis attached the polygraph instruments to Oldman[6] and conducted the polygraph examination. He then manually scored the examination with reference to the polygraph charts and concluded by them that Oldman had been deceptive during the polygraph test. He then confronted Oldman with the fact that he thought

Oldman had lied during the questions relevant to the allegations against him. Oldman initially denied that he had lied, but then admitted that he had touched and put his finger in the victim's vagina more times then he had previously stated and that he had made her touch his penis on two occasions.

After Oldman confessed to the allegations, Cottis asked Oldman to put it in writing. Oldman agreed. Cottis then wrote a preamble to the statement, reading it line by line, with Oldman reading as he went. Oldman indicated he could read his handwriting. Cottis then continued to write a statement containing the elements Oldman had confessed to. Again, Cottis read it line by line out loud while Oldman read as he wrote. Oldman responded after each line that it was correct. At the end of writing and reading the statement, Cottis invited Oldman to make any changes as necessary. Oldman did not make any changes and said that it was a correct statement.[7]

Cottis then invited Lyman back into the room and showed the written statement to him. After reading it, Cottis asked Oldman to write in his own handwriting a paragraph about what he felt. In two paragraphs, Oldman expressed that he was sorry for what had happened, that it

---

promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

          Signed <Raymond Oldman>
Witness:   <Joseph F. Cottis, SA, FBI, 4/27/00>
Witness: <James T. Lyman>
Time: <10:17 AM>

6. The polygraph instruments were attached to Oldman as follows: a breathing tube was attached across his chest, another across his abdomen, each attached to the other by a beaded chain; a finger plate was attached to one of his fingers; and a blood pressure cuff was attached to his arm.

7. The following is a portion of Oldman's confession from his signed statement:

> [O]n about seven separate occasions ... I did touch [victim's] vagina and put my finger in her vagina for a sexual purpose. On two separate occasions I had [victim] touch my penis with her hand for a sexual purpose. I had pulled my penis out of my pants for this purpose. I did these things up until the time she had her first menstrual cycle or period. I did not put my finger in her vagina after that time. After each time I put my finger in [victim's] vagina and after the times I had her touch my penis I told her not to tell anyone. I did not want anyone to know what I had done.

wouldn't happen again, and that he believed the statement to be true and correct and made without threat or promise. Oldman signed the statement and Cottis and Lyman signed as witnesses.

After the statement was signed, Cottis informed Oldman that he was not going to arrest him that day and that he did not usually arrest people after a polygraph. After leaving, Lyman drove Oldman home. Both Cottis and Lyman testified that at no point during the entire 3½ hour time period from picking Oldman up until dropping him off at home did either agent coerce, threaten, intimidate or make promises to Oldman.

On June 5, 2000, Jerry Getz ("Getz"), a special agent of the FBI in Chicago, received an indictment and arrest warrant for Oldman. Oldman was working as a foreman for a pipeline company near Bloomington, Illinois.[8] Getz drove to Oldman's workplace and arrested him. No Miranda rights were read at that time. During the approximately one hour, 60 mile, trip back to Chicago, Getz and Oldman talked during the ride, although they did not talk about the charges against Oldman. During the ride, Getz called and had an initial appearance scheduled for the next morning, the earliest available date. Getz and the other arresting agent, E.W. Priestap ("Priestap"), took Oldman to a room in the federal building in Chicago used for booking, where Oldman was fin-

gerprinted and photographed. After booking him, Oldman was handcuffed to a table in the same room and Getz,[9] seated across from him, presented him with form FD395, reading it line by line and asking after each sentence whether he understood his rights as read. Oldman indicated each time that he did. Oldman then signed form FD395, after which Getz and Priestap signed it as witnesses. Getz then explained to Oldman why he was arrested, which included two counts of sexual abuse of a child and one count of intimidating a witness. Next, Getz asked Oldman if he wanted to talk about Count I of the Indictment charging him with sexual abuse of a child. Oldman indicated he did. Getz then wrote down Oldman's statement, confirming with Oldman its accuracy sentence by sentence. At the end, Getz then reread the whole statement to Oldman verbatim. Getz then asked Oldman if he had any questions or if he desired to make any changes. Oldman responded no to both. He then signed the statement, with Getz and Priestap signing as witnesses.[10]

Getz proceeded in a like manner with respect to Count II, another instance of sexual abuse of a minor. The only noteworthy difference is that with respect to Count II, Oldman did make one change after the statement was written and reread to him: he changed the location of the incident from the bathroom to the bedroom. Oldman said the statement was

---

**8.** Oldman's work location, and hence the place of his arrest, was also described as "near Lexington, Illinois." Defendant made no issue of the discrepancy.

**9.** Getz also testified that to the best of his recollection, Priestap was seated at the table the entire time of Oldman's interview.

**10.** Oldman's Count I statement is as follows, in relevant part:
"I ... engaged in a sexual act with [victim] who was younger than 12-yrs old ... The

incident took place at my residence [in Utah]. While the exact date is unknown by me, one night, around 10:00/pm or 11:00/pm, I went into her bedroom and woke her from her sleep. With [victim] lying under her covers, I reached under the covers to her genital area and with my fingers, I felt her. I did not put my fingers all the way into her, I just stayed on top and played with her for a minute or less. After that I went back to my bedroom."

accurate and signed it, after which Getz and Priestap signed as witnesses.[11]

Getz then informed Oldman of Count III of the Indictment, relating to threatening or intimidating a witness. Oldman denied Count III, after which the interview ended and Getz continued with processing Oldman's arrest. The entire interview took between an hour and an hour and ten minutes. Oldman was then transported to the Chicago Metropolitan Correctional Center ("MCC"), where he was turned over for overnight custody. The total time from Oldman's arrest until he was transported to MCC was approximately three hours.

Neither Getz nor Priestap ever raised their voices to defendant, nor did they coerce him, physically abuse him or use foul language.

## II. Right to Counsel and Other Miranda Rights

### A. Sixth Amendment Right to Counsel

The Sixth Amendment states, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const.Amend. VI. In *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion), the United States Supreme Court explained when the Sixth Amendment right to counsel attaches:

> The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government

has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable. [Citations omitted.]

At 689–90, 92 S.Ct. 1877.

The Tenth Circuit has held that an "ineffective assistance claim simply cannot stand" where "the government had not [yet] initiated formal proceedings against" a defendant. *United States v. Alvarez*, 142 F.3d 1243, 1250 (10th Cir.1998). In so ruling, the Court acknowledged that the "right to counsel 'does not attach until the initiation of formal adversary criminal proceedings[,]" "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"" *Id.* (citing *Lucero v. Gunter*, 17 F.3d 1347, 1351 (10th Cir.1994)) (quoting *Kirby* at 689, 92 S.Ct. 1877).

Once formal proceedings have been initiated, however, the Sixth Amendment right to counsel attaches and "the government [cannot] initiate questioning in the absence of counsel without potentially violating that right." *United States v. Leon–Delfis*, 203 F.3d 103, 111 (1st Cir.2000) (citing *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)).

---

**11.** Oldman's Count II statement is as follows, in relevant part:

> I … engaged in a sexual act with [victim] who was younger than 12–yrs old … The incident took place at my residence [in Utah]. While the exact date is unknown, one evening, while no other family members were inside the house, [victim] was standing in the ~~bathroom~~ [initialed] bed-

room. She was wearing a shirt and shorts when I approached her and placed my hands inside the front-side of her shorts and inside her underpants. With my fingers, I played with her vagina for approximately less than one minute. I put my fingers partly inside her but never fully inside her. After that, I walked outside the bedroom and went about my day.

In other words, once the government has entered into a formalized adversarial relationship with an individual, it needs to tread carefully so as not to infringe upon the defendant's Sixth Amendment right to counsel.

■ A defendant, may, however, opt to waive his Sixth Amendment right to counsel. *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). Once the right to counsel attaches, a court should "indulge every presumption against waiver of fundamental constitutional rights." *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). In other words, the burden lies upon the government to establish that a defendant has waived his rights to counsel. The Supreme Court has held that where a defendant has waived his Fifth Amendment right to counsel after appropriate *Miranda* warnings, he has properly waived his right to counsel under the Sixth Amendment too. *Patterson*, 487 U.S. at 292, 108 S.Ct. 2389.[12] Otherwise stated, proper *Miranda* warnings appear to satisfy both the Fifth and Sixth Amendments. As the Eighth Circuit stated:

> Our examination of the relevant cases leads us to conclude that the appropriate standard for reviewing the validity of a waiver of the Sixth Amendment right to have counsel present at an interrogation is essentially the same standard applied to waivers of the Fifth Amendment right to counsel where the right to counsel has been previously invoked.

*United States v. Eagle Elk*, 711 F.2d 80, 82 (8th Cir.1983) (Citations omitted).

In this light, it is appropriate to turn to the Fifth Amendment to analyze what constitutes proper waiver of the right to counsel.

## B. FIFTH AMENDMENT RIGHT TO COUNSEL

*Required Procedural Safeguards*

■ The Fifth Amendment reads, in relevant part: "No person ... shall be compelled in any criminal case to be witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. While this constitutional provision does not expressly acknowledge a right to counsel, such a right is implicitly recognized. In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that a criminal suspect must be afforded certain procedural safeguards before conducting a custodial interrogation. These safeguards attach where a suspect 1) is in custody, and 2) is questioned is such a way as to be deemed an interrogation.[13] *Id.*

*Determining Existence of Custody during Interrogation*

■ The first question, whether a suspect is in custody, depends on whether he "has been deprived of his freedom of action in any significant way." *Id.* This occurs when "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir.1993) (citations omitted). The standard is not a subjective one, but is objective in nature, i.e., whether

---

**12.** The Court stated: "In this case, we are convinced that by admonishing petitioner with the Miranda warnings, respondent has met this [Sixth Amendment] burden and that petitioner's waiver of his right to counsel at the questioning was valid." *Patterson*, 487 U.S. at 292, 108 S.Ct. 2389.

**13.** In its Memorandum in Support of Government's Response to Defendant's Motion to Suppress Confessions, the United States concedes that the interviews of Oldman amount to interrogation. The only remaining consideration for determining whether *Miranda* warnings were necessary, then, concern whether Oldman was in custody when interrogated.

a reasonable person in that position would understand himself to be under arrest. *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir.1993). This requires a review of the circumstances surrounding the interrogation without regard to the views of either the officers involved or the suspects. *Stansbury v. California*, 511 U.S. 318, 321, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam).

■■■ In reviewing such a matter, a court must look to the totality of the circumstances. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Mere presence at a police station during interrogation is not alone sufficient to establish that a suspect was in custody. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (suspect came voluntarily to police station and was immediately informed that he was not under arrest). Likewise, the mere provision of *Miranda* warnings does not itself "convert an otherwise non-custodial interview into a custodial interrogation." *United States v. Bautista*, 145 F.3d 1140, 1148–49 (10th Cir.1998).

*Determining Waiver of Miranda Rights*

■■■ Even though *Miranda* warnings are required when a defendant or suspect is in custody and under interrogation,[14] such person may opt to waive his *Miranda* rights. It is the government's burden, however, to establish by a preponderance of the evidence that the person in question waived his right to counsel in order for a statement given under custodial interrogation to be admissible at trial. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *See*

also *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. McCullah*, 76 F.3d 1087 (10th Cir.1996). It must prove that the suspect's alleged confession is voluntary, i.e., not coerced. *Connelly*, 479 U.S. at 168, 107 S.Ct. 515. Indeed, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Id.* at 170, 107 S.Ct. 515. As a corollary to that, absent coercion, involuntariness cannot exist. *See id.* at 167, 107 S.Ct. 515 ("Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' ") The burden comprises the obligation "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602.

■■■ In order to establish a valid waiver, the government must prove that defendant 1) relinquished his rights voluntarily, and 2) knew that he was waiving his right and what the consequences of that waiver would be. *Moran v. Burbine*, 475 U.S. 412, 417, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). As in establishing custody, the Court must look at the totality of circumstances in determining whether a waiver of the right to counsel is valid. The Tenth Circuit has acknowledged the probative value of having a suspect sign a waiver form: "A defendant's act of signing a waiver form prior to confession, though not conclusive, is 'usually strong proof' of the voluntariness of the waiver." *United States v. Fountain*, 776 F.2d 878, 886 (10th Cir.1985). Other factors that may assist in determining whether a confession is

14. The Supreme Court recently has upheld the requirement to give *Miranda* warnings even though responses to custodial interrogation is claimed to be entirely voluntary. *See Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Prior to *Dickerson*, this court ruled that such interrogation, if found to be entirely voluntary in accordance with an existing federal statute, would obviate the necessity of *Miranda* warnings. *See United States v. Tapia–Mendoza*, 41 F.Supp.2d 1250 (1999).

coerced or voluntary are the following: "(1) age, intelligence and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997).

### *"Post–Test" Polygraph Interrogation*

In the context of polygraph examinations, the Supreme Court held in *Wyrick v. Fields*, 459 U.S. 42, 47, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), that the defendant "validly waived his right to have counsel present at 'post-test' questioning, unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." The Court went on to say:

> The Court of Appeals relied on two facts indicating the need for a new set of warnings: the polygraph examination had been discontinued, and [defendant] was asked if he could explain the test's unfavorable results. To require new warnings because of these two facts is unreasonable. Disconnecting the polygraph equipment effectuated no significant change in the character of the interrogation.

*Id.*

■ In *U.S. v. Leon–Delfis*, 203 F.3d 103 (1st Cir.2000), the First Circuit ruled that the district court had improperly admitted into evidence a defendant's confession that had come after he had submitted to a polygraph test. In so holding, the Court held that the Sixth Amendment had clearly attached at the time of the interrogation and that the continued questioning after the polygraph was a violation of his Sixth Amendment right to counsel. In reaching this conclusion, the Court relied on two crucial facts: defendant "was neither told that post-test questioning would occur, nor signed a waiver that specifically mentioned the possibility of post-test questioning." *Leon–Delfis*, 203 F.3d at 111. It therefore appears necessary in the instance of a polygraph examination followed by a post-test interview that defendant be warned of the post-test interview at the outset, and that he expressly waive his right to counsel for that interview.[15]

### III. APPLICATION OF *MIRANDA* RIGHTS TO ALLEGED CONFESSIONS

### A. APRIL 27, 2000, CONFESSION

#### *No Sixth Amendment Right to Counsel*

Since "the government ha[d] not [yet] initiated any formal proceedings against" Oldman before the April 27, 2000, interrogation, the Sixth Amendment right to counsel had not yet attached. *See Alvarez*, 142 F.3d at 1250. Oldman's Fifth Amendment right to counsel, however, had attached. The question whether the government need to provide Oldman with proper *Miranda* warnings pivots on whether he was in custody and whether his interview amounted to an interrogation.[16] *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

#### *Defendant was not in Custody*

■ When Lyman arrived at Oldman's house to take him to Montezuma Creek to

---

**15.** See discussion of polygraph interrogation standards and requirements as enunciated by this court in *United States v. Bishop*, 64 F.Supp.2d. 1149 (1999).

**16.** As mentioned in fn 13, supra, the United States concedes that Oldman's interviews amount to interrogation. The court accepts that concession at face value, and therefore will examine only whether Oldman was in custody at the time of the interrogation.

undergo the polygraph examination, Oldman entered Lyman's car of his own free will. There is no evidence that he was acting under threat or coercion, and it affirmatively appears that he was willing to take the polygraph without reservation and voluntarily. He was not forced into Lyman's car or handcuffed, but opened the door himself and sat in the front seat as a passenger. At no point between then and being dropped back off at his house in Aneth, Utah, does it appear that he was subject to any force or that he was otherwise "deprived of his freedom of action in any significant way." *Id.* During the course of the interview, and before he was hooked up to the polygraph implements, Oldman in an informed and voluntary way signed the statement acknowledging his right to refuse to answer any questions and to leave at any time. If any constraints were placed on him by this setting, and none appear evident, his "freedom of action [was] not curtailed to a 'degree associated with formal arrest.'" *Perdue,* 8 F.3d at 1463.

*Cultural Background of Alleged Oppression of Indians Not Admissible under Objective Standard*

Defendant urges the court to take into special account and give consideration his life on the Navajo Reservation, claiming that minorities "perceive prevailing enforcement authorities as the continuing hand of those that have previously abused them[,] ... are ... submissive to these powers out of ignorance," and that "[t]he Native American ... is a prisoner in his own land" not familiar with "the formalities of the 'white man's law.'" This may or may not be the case, but the court has no evidence before it suggesting that Oldman shares such views. An objective review of the totality of the circumstances— i.e., the evidence before the court at this time—suggests the opposite: that no reasonable person in Oldman's position could

have understood himself to be under arrest. *See California,* 463 U.S. at 1125, 103 S.Ct. 3517.

The only factors that lean in favor of concluding that Oldman was in police custody are that a police vehicle transported him to and from his polygraph examination and that he underwent that examination at a police facility. Like the defendant in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), Oldman went to the police station voluntarily and was not told at any point that he was under arrest, but rather told that he could end the interview at any point. The police station setting is not sufficient to construe that Oldman was in custody. *Id.* at 495, 97 S.Ct. 711. In sum, the totality of the circumstances suggest that Oldman was not in custody that day and that the *Miranda* warnings were not required prior to the questioning.

*Miranda Warnings were Properly Given*

Moreover, assuming without deciding that Oldman was in custody on that day, Agents Lyman and Cottis gave Oldman proper *Miranda* warnings. The evidence shows no governmental coercion, which is "the sole concern of the Fifth Amendment." *Connelly,* 479 U.S. at 168, 107 S.Ct. 515. The unrebutted evidence shows by a preponderance of the evidence that Oldman was treated decently and properly at all times, without the use of threat, force or intimidation. In all, there was an absence of police coercion, that "necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* at 167, 107 S.Ct. 515.

*Defendant Voluntarily Waived his Miranda Rights In General and in re "Post–Test" Polygraph Interrogation*

■ The evidence further more shows "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda,* 384 U.S. at

475, 86 S.Ct. 1602. He was informed carefully of his right to counsel and his right to cease the interrogation at any time, and furthermore signed both form FD395 and FD328. Both forms include the following clear indication that he knew what his rights were and that he chose intelligently to waive those rights: "I have read this statement of my rights and I understand what my rights are.... I understand and know what I am doing." Defendant has presented no evidence to rebut these statements, which constitute " 'strong proof' of the voluntariness of [his] waiver." *Fountain*, 776 F.2d at 886. In addition, the factors listed in *Glover* —age, intelligence, education, length of detention, length of questioning, nature of questioning, whether he was advised of his rights and whether he was subjected to physical punishment—show that Oldman's confession was voluntary and intelligent. *See Glover*, 104 F.3d at 1579. He is an adult with a high school education who was questioned but not detained for about 3½ hours, and was advised of his constitutional rights but was never subject to physical punishment. These unrebutted facts show that he relinquished his rights voluntarily and that he knew he was waiving those rights and what the consequences would be—all which establish that his waiver was valid. *See Moran*, 475 U.S. at 417, 106 S.Ct. 1135.

Defendant raises the additional issue of whether he validly waived his right to counsel for the polygraph post-test, as distinguished from the preceding interview questions. There appears to have been no break in the questioning, no change in the character of the interrogation, no indication that Oldman changed his mind or was coerced before the post-test interview, and this court concludes as was determined by the Supreme Court in *Wyrick v. Fields* that "[d]isconnecting the polygraph equipment effectuated no significant change in the character of the interrogation," and therefore Oldman "validly waived his right to have counsel present at [the] 'post-test' questioning." *Wyrick*, 459 U.S. at 47, 103 S.Ct. 394.

Oldman also cites the First Circuit's standard *Leon–Delfis* in support of a requirement that a suspect be re-Mirandized before the post-test interview. But the two crucial facts leading to the conclusion that a defendant must be re-read his rights are inapposite to the instant case. Unlike the defendant in *Leon–Delfis,* Cottis informed Oldman that there would be post-test questions. Because he was so informed, when he signed the waivers on the two forms, he understood that he was agreeing to be interviewed and chose to waive his rights to counsel. Absent invocation of those rights during the interview by refusing to answer any question or by deciding to leave or request the presence of an attorney, Oldman intelligently and validly waived his rights. The standard in *Leon–Delfis* simply does not apply to the instant facts.

Based upon the foregoing, Oldman's Motion to Suppress the first confession is denied.

### B. JUNE 5, 2000, CONFESSION[17]

■ As of the date of Oldman's second signed statement, the government had already initiated formal proceedings against him and both his Sixth and Fifth Amendment rights to counsel apply. Since the FBI agents in Chicago did not administer a polygraph examination at that time, and furthermore since it is clear Oldman was in custody during this second interroga-

---

**17.** Since the first confession is admissible, a discussion of the doctrine of attenuation is unnecessary, which would address whether the first confession could taint the statements given on June 5 in Illinois.

tion, the only question that remains is whether Oldman properly waived his right to counsel. Once again, the court must look to the totality of the circumstances in reaching that conclusion.

There were irregularities in the arrest, processing and interrogation of defendant in Illinois: 1) he was not initially informed of why he was arrested, and 2) he was not informed of his rights until after he was booked and Getz and Priestap were about to begin their interrogation. However, defendant's Motion to Suppress the statements made at the federal building in Chicago occurred after Getz had informed Oldman of his rights and had signed form FD395. Any statements made before the signing of form FD395 may well be suppressible, but are not the subject of the present inquiry.[18]

The circumstances surrounding Oldman's arrest and interrogation otherwise appear routine and unremarkable. Oldman cooperated fully with his arrest and processing and appeared to have an amicable relationship with Getz and Priestap. As was the case during the April 27, 2000, interview, the agents on June 5 did not use any force, threat or coercion during the process of the interrogation. The form FD395 was the identical form FD395 Oldman had also signed at Montezuma Creek. One noteworthy difference between the interrogation in Chicago and the one in Utah was that Oldman appeared to cooperate more readily at the later date. When asked if he wanted to give a statement, he said he did and proceeded to confess to acts surrounding both Counts I and II.[19]

After Getz re-read his statement to him, Oldman said it was accurate and did not make any changes, showing that his statement was given readily and voluntarily, once again constituting " 'strong proof' of the voluntariness of the waiver." *Fountain*, 776 F.2d at 886. The waiver form contains a sufficient description of Oldman's Fifth Amendment right to counsel and a proper waiver of that right and the other *Miranda* rights. The apparent absence of governmental coercion ("the sole concern of the Fifth Amendment") and an analysis of the totality of the circumstances lead this court to conclude that the June 5 interrogation was proper and that Oldman validly waived his rights to counsel, being sufficiently informed and aware of the consequences of is actions. *See Moran*, 475 U.S. at 417, 106 S.Ct. 1135. Accordingly, defendant's Motion to Suppress statements mad on June 5 is denied.[20]

## IV. CONCLUSION

Based upon the foregoing, it is hereby ORDERED that defendant's Motion to Suppress is DENIED.

This case is set for a scheduling conference on July 31, 2001, at 10:00 a.m. to set a trial date.

---

18. The present inquiry concerns the statements relating to both Count I and Count II. Since the circumstances are virtually identical and occurred during the same interrogation, the court will treat them together.

19. As acknowledged above, Oldman denied the allegations contained in Count III and no statement was prepared as to that Count.

20. The statements in question made during the June 5 interrogation occurred during the same interrogation, with no break in the questioning and with no apparent change in circumstances such as would require a second reading of the *Miranda* rights.